Whttbeck, P.J.
 

 A jury convicted defendant Janice Cain of larceny over $100, MCL 750.356; MSA 28.588/ for an extended series of events in which Cain took approximately $250,000 from the late Marguerite “Peg” Bergdahl,
 
 [1]
 

 [2]
 
 an elderly woman for whom Cain
 
 *99
 
 acted as a limited guardian. The trial court sentenced Cain to two to five years’ imprisonment, but she is free on bond pending appeal. We affirm the conviction and sentence in this case.
 

 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 

 A. BERGDAHL
 

 Bergdahl’s friends and acquaintances, some of whom knew her for more than fifty years, described her as a “meticulous” dresser, a “true lady,” a “sweetheart,” “very capable,” an independent decisionmaker, and “careful” with her money. Nevertheless, after Roger, Bergdahl’s husband of thirty-seven years, and her mother died within a month of each other in late fall 1988, her friends noticed changes in her demeanor, mental acuity, and outward appearance.
 
 [3]
 
 According to Goldie Paul, a friend from grade school, Bergdahl began “deteriorating,” seemed “very depressed,” and uncharacteristically failed to notice when her clothing was in disarray. Paul discovered that Bergdahl had been swindled in several scams through the mail. Mary Trebilcock, a long-time acquaintance, also noted Bergdahl’s tendency to fall for scams and her increasing forgetfulness. Mary Tasson, another acquaintance, observed that Bergdahl would repeat herself, sometimes mentioning the same thing six or seven times in an hour. Tasson noticed that Bergdahl had difficulty remembering people and seemed “confused.”
 

 
 *100
 
 James Tobin, M.D., Bergdahl’s family physician, was also aware of her mental deterioration. He was generally concerned about her ability to “function at home and make decisions.” Bergdahl, who had previously arranged for Mary Trebilcock’s husband to hold a power of attorney
 
 [4]
 
 to make certain financial and medical decisions for her, contacted Tobin on June 19, 1991, and requested that he prepare a letter regarding her mental status because she felt that she needed a guardian. Tobin wrote the letter and also noted in her medical record that Bergdahl wanted someone to manage her money for her.
 

 On the basis of his review of Bergdahl’s hospital records and personal observations, Tobin concluded that by June 1991 Bergdahl had “impaired mental capacity” and suffered from “senile dementia” or “chronic brain syndrome.” He believed that her mental health problems may have been attributable to several short episodes in the 1980s when she had poor blood circulation to her brain. Some of Bergdahl’s acquaintances, such as Shelba Johnson, did not observe anything “abnormal” about Bergdahl’s appearance, demeanor, or social skills well into 1992. However, four other physicians, two doctors in general practice who treated Bergdahl and two psychiatrists testifying as experts, agreed with Tobin that Bergdahl had either Alzheimer’s disease or a form of senile dementia by the summer of 1991. Although these doctors could not pinpoint a date on which Bergdahl became incompetent, they noted that her
 
 *101
 
 competence was likely intermittent that summer and certainly grew worse with time. As becomes apparent later in this opinion, Bergdahl’s competency is critical to whether she could have granted Cain consent to take the money at issue.
 

 B. THE RELATIONSHIP BETWEEN BERGDAHL AND CAIN
 

 The record does not indicate precisely when Bergdahl met Cain. We do, however, know that Cain was acquainted with Roger Bergdahl, although several witnesses testified that Bergdahl may not have liked Cain while Roger Bergdahl was alive. In any event, Cain and Bergdahl became better acquainted after Roger Bergdahl’s death in 1988 when Cain gave Bergdahl a dog named Jet, whom Bergdahl adored.
 

 Cain began to take care of Bergdahl, who did not have children, taking her to church and including her in holiday celebrations. Cain assisted Bergdahl by driving her around town, taking her to doctor’s appointments and occasionally doing tasks like grocery shopping or arranging for household repairs; other hired caregivers attended to more personal aspects of Bergdahl’s care. Cain’s assistance gave her increasing control over Bergdahl’s money.
 

 According to Tobin and notes taken by nurses at Bell Memorial Hospital, by early June 1991 Cain was aware that Bergdahl was experiencing episodes of dementia. Cain expressed concern about Bergdahl’s mental status to medical staff and even called the probate court in June 1991 to inquire about guardianship for Bergdahl. In early July 1991, Cain took Bergdahl to see Bergdahl’s attorney, David Savu, to draft a power of attorney and a new will. Savu finished drafting the power of attorney giving Cain
 
 *102
 
 authority to make medical and financial decisions
 
 for Bergdahl’s benefit
 
 in September 1991. After going through several drafts, including making changes Bergdahl allegedly proposed but which Cain typed, Savu finalized the new will in December 1991, making Cain the personal administrator and leaving Cain the residue of the estate; at that time Savu did not know that the residue of Bergdahl’s estate likely totaled hundreds of thousands of dollars.
 

 Meanwhile, in late July 1991, Bergdahl purportedly agreed to allow Cain to “borrow” as much of Bergdahl’s money as Cain desired. The writing for this agreement said:
 

 AN AGREEMENT BETWEEN MARGUERITE G. BERGDAHL AND JANICE C. CAIN
 

 I Marguerite G. Bergdahl do here by [sic] give permission to Janice C. Cain to have access to and use any of my personal money for her professional and/or personal use.
 

 The payback schedule will commence upon the first anniversary of the opening of her business, in an amount affordable to her business.
 
 [5]
 

 This is due to her not taking payment for any of her work done for me.
 

 Both Cain and Bergdahl signed the document and dated it July 30, 1991. Two witnesses, Trisha Signs and Jackie Caskey signed at the bottom of the agreement, also dating their signatures as July 30, 1991.
 

 We say that Bergdahl “purportedly” agreed to allow Cain to borrow this money because, in addition to the question of capacity to consent, there is some dispute
 
 *103
 
 in the record regarding the circumstances under which she and Cain executed the writing. One of the witnesses, Trisha Signs, testified that she did not witness Bergdahl sign the agreement; in fact, Signs did not recall any signatures on the page at the time she signed her name to the document. Rather, Bergdahl waited in the car outside Signs’ home one evening while Signs and Cain went in the home to “witness” the document’s execution. Signs did not remember the document looking as it did in court. She recalled, but could not describe, several other pages, perhaps a cover sheet or letter to Bergdahl’s attorney, attached to the agreement. Furthermore, she did not believe that she actually signed the document on July 30, 1991, but that Cain asked her to write that date. In contrast, Jackie Caskey testified that she was present when Bergdahl signed the document and that she appeared to sign the document willingly, having said, “[I]t’s my money, I will do as I please.” Caskey, who admitted that she did not read the written agreement, said that she did not have any reason to believe that she witnessed Bergdahl and Cain sign the writing on any date other than July 30, 1991. Regardless of the legal validity of this document, it had an immediate effect on Bergdahl’s finances.
 

 Lisa Blondeau, a teller at the Ishpeming Credit Union in July 1991, said that she was working July 30, 1991, the same day Cain and Bergdahl signed the writing, when Cain walked in shortly before closing time. Cain had three checks totaling more than $147,000 issued by other financial institutions and made out to Bergdahl. Cain asked Blondeau to open joint checking and savings accounts in Cain’s name and Bergdahi’s name. Blondeau originally objected
 
 *104
 
 because the bank was only open for business for another five minutes and Bergdahl was not present. However, Cain persuaded Blondeau to open the accounts by arguing that she did not want to carry the checks with her because she might lose them and promising to bring Bergdahl into the bank the next day to sign the paperwork for the accounts. Bergdahl apparently did sign the account papers at some later date.
 

 The following year, in July 1992, Bergdahl’s cousin, Judy Spencer, filed a petition for guardianship in the probate court. The probate court appointed attorney Paul Peterson as Bergdahl’s guardian ad litem late that summer and appointed Cain as Bergdahl’s limited guardian in December 1992. Peterson, who did not know about the July 1991 agreement between Cain and Bergdahl when Cain was appointed guardian, said that the guardianship order only permitted Cain to use Bergdahl’s money for Bergdahl’s benefit. Peterson also clarified that the order made no provisions for Cain to be paid for her work as guardian.
 

 Peterson recommended to the probate court that it appoint a conservator to audit Bergdahl’s financial records because Cain had already been acting in what he considered to be a fiduciary role with Bergdahl for some time. The effort to find a conservator continued until August 1993, when the court appointed Richard Wilson as conservator over Cain’s request to be appointed for that position. Cain placed Bergdahl in a nursing home that same month.
 

 Wilson immediately began investigating Bergdahl’s finances in August 1993. He asked Cain to produce all financial statements for Bergdahl, and she produced a complete set of statements for the joint account at
 
 *105
 
 the Ishpeming Credit Union, denying any knowledge of additional accounts. Wilson searched Bergdahl’s house for additional financial records and found statements from several banks evidencing a significant number of transactions for large sums of money. His discovery prompted him to ask Cain what she had purchased for Bergdahl with her money. According to Wilson, Cain was “vague” regarding how she had spent Bergdahl’s money. He eventually learned that Cain had been paying herself $500 a month as a guardian, and she had failed to make any attempt to have Bergdahl’s health insurance company reimburse her for bills. To Wilson, Cain appeared to have a cavalier approach to spending Bergdahl’s money. In total, Wilson found approximately $203,000 in unexplained withdrawals from Bergdahl’s accounts and could not locate approximately $20,500 in income that Bergdahl had earned from social security and other sources.
 

 Wilson went to the police with his concerns about Cain’s management of Bergdahl’s finances in October 1993, when he learned that Bergdahl only had approximately $25,000 in liquid assets remaining. The probate court appointed Wilson as Bergdahl’s guardian at that time. Although the police investigation commenced in October 1993, the prosecutor waited to file larceny charges against Cain until February 1995.
 

 C. PROCEEDINGS BELOW
 

 At trial, which began in May 1997, Lieutenant James Bjome, a detective with the Marquette County Sheriff’s Office, explained his investigation into Bergdahl’s financial affairs. He tracked all transactions involving cash or other liquid assets over $500, determining what happened to Bergdahl’s certificates
 
 *106
 
 of deposit, money-market accounts, and other bank accounts. His testimony revealed that Cain essentially took the bulk of Bergdahl’s assets and first deposited them into joint accounts listing both her name and Bergdahl’s name. Then Cain either transferred money from those joint accounts to separate accounts, to which Bergdahl had no access, or Cain simply converted those “joint” assets into cash, which she spent. Using canceled checks, travelers’ check stubs, credit card records, and account statements, Bjome was able to demonstrate a direct flow of assets from Bergdahl to Cain.
 

 Testimony by other individuals revealed how Cain used this money largely for her own benefit.
 
 [6]
 
 For example, Cain’s acquaintances noted that she refurbished her home with new carpeting, furniture, and appliances, bought a car, took trips, and gave uncharacteristically expensive gifts at Christmas. These spending habits stood in contrast to testimony by some of Bergdahl’s live-in caregivers. They described Cain as controlling not only who could visit or speak with Bergdahl and the mail she read, but how much money Bergdahl spent on gasoline for trips around town, home repairs, and personal items. At least one caregiver commented that, during a particularly hot spell one summer, Cain refused to pay (with Bergdahl’s money) for screens for the windows
 
 *107
 
 of Bergdahl’s house to let in cooler air. There was no evidence that Cain deprived Bergdahl of basic necessities. However, Wilson testified that he took an appraiser through Bergdahl’s house and that the appraiser determined that the furnishings inside were worth only about $7,000 in all, an insufficient value to demonstrate that Cain spent the missing money on Bergdahl.
 

 The jury found Cain guilty of a single charge of larceny over $100, MCL 750.356; MSA 28.588. Defense counsel declined the trial court’s offer to poll the jury but the court, on its own initiative, asked the jurors if they unanimously agreed on a single transaction that constituted the offense. The jury foreperson stated that they all agreed that Cain’s act of cashing a certificate of deposit, which occurred after the probate court appointed her guardian and informed her not to use Bergdahl’s money for her own benefit, constituted larceny.
 
 [7]
 
 The trial court subsequently sentenced Cain to two to five years in prison, an upward departure from the sentencing guidelines’ recommendation of zero to nine months’ imprisonment.
 

 □. PREARREST DELAY
 

 A. CAIN’S ARGUMENT
 

 Cain argues that the sixteen-month delay between when Wilson went to the police with his suspicions
 
 *108
 
 and when the police arrested her for larceny requires this Court to overturn her conviction. Specifically, Cain contends that the time that elapsed prejudiced her because witnesses, especially Bergdahl, forgot pertinent information and Wilson threw away evidence while cleaning out Bergdahl’s house. We disagree.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 Cain raised this issue at the hearing on her motion to dismiss, thereby preserving it for appeal. See generally
 
 People v Gilliam,
 
 108 Mich App 695, 698; 310 NW2d 843 (1981) (a defendant should raise alleged violations of due process in the lower court, but if the violation is serious a failure to preserve the issue does not preclude review). A challenge to a prearrest delay implicates constitutional due process rights, which this Court reviews de novo.
 
 People v McIntire,
 
 232 Mich App 71, 93; 591 NW2d 231 (1998), rev’d on other grounds 461 Mich 147; 599 NW2d 102 (1999).
 

 C. THE BALANCING TEST
 

 Michigan applies a balancing test to determine if a prearrest delay requires reversing a defendant’s conviction because the state may have an interest in delaying a prosecution that conflicts with a defendant’s interest in a prompt adjudication of the case.
 
 People v Bisard,
 
 114 Mich App 784, 790; 319 NW2d 670 (1982). A defendant has the burden of coming forward with evidence of prejudice resulting from the delay while the prosecutor has the burden of persuading the reviewing court that the delay was not deliberate and did not prejudice the defendant.
 
 Id.
 
 at 791.
 
 *109
 
 The Court in
 
 McIntire, supra
 
 at 94, expressed the
 
 Bisará
 
 analysis in three parts:
 

 [I]n order to establish a due process violation in the context of prearrest delay a defendant must first demonstrate prejudice. The prosecutor then bears the burden of persuading the court that the reason for the delay was sufficient to justify whatever prejudice results. In evaluating the reason for the delay, the court may consider the explanation for the delay, whether the delay was deliberate, and whether undue prejudice attached to the defendant. [Citations omitted.]
 

 Michigan adopted this rule, in part, because the United States Supreme Court established “that the Due Process Clause plays a limited role in preventing unjustified preindictment or prearrest delay.”
 
 People v White,
 
 208 Mich App 126, 134; 527 NW2d 34 (1995), citing
 
 United States v Marion,
 
 404 US 307, 324-326; 92 S Ct 455; 30 L Ed 2d 468 (1971).
 

 D. LACK OF PREJUDICE
 

 We conclude that Cain’s argument with respect to prejudice is simply too speculative to justify reversing her conviction. Although testimony at trial indicated that some witnesses could not give a specific date to different occurrences they remembered, Cain has not suggested how this slight memory failure worked to her disadvantage or why those dates were critical to her defense. In essence, without allegations that these witnesses forgot specific evidence helpful to Cain’s defense, we cannot conclude that the absence of the evidence was prejudicial. Similarly, Cain has not delineated what evidence Wilson might have thrown away while cleaning Bergdahl’s house, contrary to his testimony that he was careful to save anything that
 
 *110
 
 looked important. Although Wilson admitted throwing away some canceled checks and financial records, he explained that they were from unrelated accounts or a period when Cain apparently did not know Bergdahl. Therefore, we see no prejudice flowing from the prosecution’s failure to retain these unidentified pieces of evidence due to a prearrest delay. In sum, Cain has failed to prove that this potential prejudice was “actual and substantial” to the extent that it “meaningfully impaired” her “ability to defend against the state’s charges” and, as a result, “the disposition of the criminal proceeding was likely affected.”
 
 People v Adams,
 
 232 Mich App 128, 135; 591 NW2d 44 (1998), quoting
 
 Jones v Angelone,
 
 94 F3d 900, 907 (CA 4, 1996).
 

 The argument regarding the failure to preserve Bergdahl’s testimony on videotape is equally merit-less. By the time Wilson went to the police with his information regarding Bergdahl’s finances, the probate court had already declared Bergdahl incompetent and she was in a nursing home with, evidently, some form of advanced dementia. We see no reasonable likelihood that at that point in time Bergdahl would have been able to answer any questions. As a result, any prearrest delay that inhibited Cain from seeking out a recorded statement by Bergdahl to the effect that she fully consented to Cain taking the money would have been of no value because she was unlikely to have been able to obtain such a statement.
 

 Furthermore, the prosecution argues that the delay was not done deliberately to prejudice Cain. Rather, the prosecution contends, and we agree, that investigating the numerous financial transactions at issue took a long time. Waiting to collect sufficient evi
 
 *111
 
 dence of the charged offense was a proper consideration in the timing of the charge in this case. See
 
 Adams, supra
 
 at 133, n 5, quoting
 
 United States v Lovasco,
 
 431 US 783, 790-791; 97 S Ct 2044; 52 L Ed 2d 752 (1977).
 

 m. SPEEDY TRIAL
 

 A. CAIN’S ARGUMENT
 

 Cain argues that the twenty-seven-month delay between her arrest and trial violated her right to a speedy trial under the federal and state constitutions. US Const, Am VI; Const 1963, art 1, § 20. Although we agree that the delay in this case was somewhat lengthy, we do not agree that it amounted to a constitutional violation.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 A defendant must make a “formal demand on the record” to preserve a speedy trial issue for appeal.
 
 People v Rogers,
 
 35 Mich App 547, 551; 192 NW2d 640 (1971). Cain did make a demand for a speedy trial in her August 1996 motion to dismiss. Therefore, this issue is preserved. We review this constitutional issue de novo.
 
 People v Levandoski,
 
 237 Mich App 612; 603 NW2d 831 (1999).
 

 C. THE BALANCING TEST
 

 A defendant has the right to a speedy trial under the federal and Michigan constitutions, which the Michigan Legislature statutorily enforces. US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MSA 28.1024. This right ensures that a guilty verdict results only from a valid foundation in fact. See
 
 People v
 
 
 *112
 

 Eaton,
 
 184 Mich App 649, 655-656; 459 NW2d 86 (1990). But see
 
 United States v MacDonald,
 
 456 US 1, 8-9; 102 S Ct 1497; 71 L Ed 2d 696 (1982). Michigan courts apply the four-part balancing test articulated in
 
 Barker v Wingo,
 
 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), to determine if a pretrial delay violated a defendant’s right to a speedy trial. See
 
 People v Collins,
 
 388 Mich 680; 202 NW2d 769 (1972). The test requires a court to consider “(1) the length of the delay, (2) the reasons for the delay, (3) the defendant’s assertion of the right, and (4) prejudice to the defendant.”
 
 People v Williams,
 
 163 Mich App 744, 755; 415 NW2d 301 (1987). This fourth element, prejudice, is critical to the analysis. A delay that is under eighteen months requires a defendant to prove that the defendant suffered prejudice.
 
 People v Taylor,
 
 110 Mich App 823, 828-829; 314 NW2d 498 (1981). However, a delay of eighteen months or more, as in this case, is presumed prejudicial and places a burden on the prosecutor to rebut that presumption.
 
 People v Simpson,
 
 207 Mich App 560, 563; 526 NW2d 33 (1994).
 

 D. THE LENGTH OF THE DELAY
 

 As noted above, the length of the delay in this case was longer than a routine period between arrest and trial. Nevertheless, we note that
 
 People v Missouri,
 
 100 Mich App 310, 319-320; 299 NW2d 346 (1980), instructs that “[t]he length of delay is not determinative of a speedy trial claim” and the delay in this case does not approach the outer limits of other delays we have addressed. See, e.g.,
 
 Simpson, supra
 
 at 564
 
 (4½
 
 years);
 
 Missouri, supra
 
 at 319-320 (thirty-one months);
 
 People v Cutler,
 
 86 Mich App 118; 272 NW2d
 
 *113
 
 206 (1978) (thirty-seven months)';
 
 People v Smith,
 
 57 Mich App 556; 226 NW2d 673 (1975) (nineteen years).
 

 E. THE REASONS FOR THE DELAY
 

 With regard to the reasons for the delay, the prosecution argues that the complex financial transactions and related evidence at issue simply took a long time to gather and analyze. This is a legitimate reason for delay. See
 
 People v Lowenstein,
 
 118 Mich App 475, 490; 325 NW2d 462 (1982). The prosecution also notes that some of the delays in this case can be attributed to Cain. Once again, we agree. For example, Cain asked for, and the trial court granted her, adjournments for an interlocutory appeal and substitution of counsel.
 
 People v Sickles,
 
 162 Mich App 344, 358; 412 NW2d 734 (1987). The court spent time adjudicating numerous motions in limine by Cain, which also weighs against her.
 
 People v Gilmore,
 
 222 Mich App 442, 461; 564 NW2d 158 (1997). At least one of the delays was due to witness unavailability, which does not weigh against either party.
 
 Sickles, supra
 
 at 356, citing
 
 Barker, supra
 
 at 530-531. Some of the delays were attributable to docket congestion, which minimally weighs against the prosecution.
 
 People v Ewing,
 
 101 Mich App 51, 55; 301 NW2d 8 (1980). When considered together, we see no evidence that the prosecution is substantially to blame for the delays in this case or that they were unwarranted.
 

 F. THE ASSERTION OF THE RIGHT
 

 Furthermore, under the third prong of the
 
 Barker, supra,
 
 analysis, we cannot ignore the fact that Cain waited eighteen months to assert her right to a
 
 *114
 
 speedy trial and that her trial commenced within nine months of when she asserted that right.
 

 G. LACK OF PREJUDICE
 

 Turning to the question of prejudice, we consider whether the delay prejudiced Cain’s person or defense.
 
 Barker, supra
 
 at 532. We note that Cain was on bond pending trial, and we conclude that the delay did not affect her person by subjecting her to lengthy pretrial incarceration. Moreover, as the prosecution asserts, the facts of this case demanded extensive pretrial preparations. Those preparations are evident in the prosecution’s trial exhibits, the length of the prosecution’s case in chief, as well as the pleadings and motions on the record, some of which benefited Cain by securing a fair trial for her.
 
 [8]
 
 MCL 768.1; MSA 28.1024. Consequently, the prosecution has rebutted the presumption of prejudice and we find no constitutional violation.
 

 IV. CHARGING MULTIPLE ACTS WITH A SINGLE COUNT
 

 A. CAIN’S ARGUMENT
 

 Cain argues that the trial court erred in permitting the prosecutor to bring a single charge of larceny while using evidence of many transactions to prove that count. Apparently, she claims this method of “lumping” the transactions together deprived her of a fair trial by relieving the prosecutor of the burden of proving that Bergdahl was incompetent when Cain cashed the final certificate of deposit in December 1992, and that the evidence of the other suspicious
 
 *115
 
 transactions was character evidence that was impermissible under MRE 404(b).
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 Although Cain addressed the single charge/multiple acts in this case while requesting a unanimous verdict instruction for the jury, we cannot find any place in the record where Cain objected to this evidence on these particular grounds. MRE 103(a)(1). Therefore, she failed to preserve this issue for review and we may examine this issue only if manifest injustice would otherwise result.
 
 People v Metzler,
 
 193 Mich App 541, 548; 484 NW2d 695 (1992).
 

 C. MANIFEST INJUSTICE
 

 We see no manifest injustice in the trial court’s decision to allow this evidence to go to the jury, for three reasons. First, mental competency is not an element of larceny over $100, MCL 750.356; MSA 28.588. Accordingly, even if this large body of evidence made it easier for the prosecution to prove that Bergdahl was incompetent, it had no obligation to do so and any error in allowing the jury to hear the evidence was harmless. Second, this evidence was clearly admissible as evidence of the actus reus of the alleged crime. See MRE 401, 402. As a result, this evidence cannot be characterized as evidence of
 
 “other
 
 crimes, wrongs, or acts.” MRE 404(b) (emphasis added). Third, charging a defendant with a single offense when there is evidence of multiple acts of wrongdoing under a theory of a continuing course of conduct is not
 
 per se
 
 impermissible. Rather, the propriety of doing so depends on any prohibition in the underlying statute, the potential for a double jeopardy
 
 *116
 
 violation, a less than unanimous jury verdict, or other particular evidentiary problems unique to a case. See
 
 People v Payne,
 
 177 Mich App 464, 468; 442 NW2d 675 (1989); see also generally
 
 People v Cooks,
 
 446 Mich 503, 524; 521 NW2d 275 (1994). We do not see any of those troublesome circumstances in this case, especially in light of the jury’s specific indication that it unanimously found Cain guilty on the basis of the same act.
 

 V. “LEGAL IMPOSSIBILITY”
 

 A. CAIN’S ARGUMENT
 

 Cain argues that the July 30, 1991, agreement legally entitled her to take Bergdahl’s money. Even if the contract were not valid, Cain argues, she had a good-faith belief that she had a right to possess the money, which is sufficient to establish her claim of right defense. Thus, she contends, it was “legally impossible” for her to commit larceny when she took Bergdahl’s money. We disagree.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 We cannot locate any place in the trial court record where Cain argued that her conviction for larceny was legally impossible. Consequently, this issue does not appear to be preserved for our review. However, although it is neither preserved nor technically presented for our review in the statement of the issues, MCR 7.212(C)(5), we will address Cain’s argument to the limited extent that it suggests that there was insufficient evidence to convict her of the charged offense. Criminal defendants do not need to
 
 *117
 
 take any special steps to preserve a challenge to the sufficiency of the evidence. See
 
 People v Lyles,
 
 148 Mich App 583, 594; 385 NW2d 676 (1986). The evidence is sufficient to convict a defendant when a rational factfinder could determine that the prosecutor proved every element of the crimes charged beyond a reasonable doubt.
 
 People v Daniels,
 
 192 Mich App 658, 665; 482 NW2d 176 (1991).
 

 C. DEFENSE TO LARCENY
 

 Cain essentially confuses the doctrine of legal impossibility with a claim of right defense. To be clear, the doctrine of legal impossibility operates as a defense when a defendant’s conduct does not actually violate a statute, no matter how culpable it appears.
 
 [9]
 
 See generally LaFave & Scott, Criminal Law, § 6.3(a),
 
 *118
 
 p 511;
 
 People v Jacoboni,
 
 34 Mich App 84; 190 NW2d 720 (1971). In other words, the doctrine of legal impossibility applies when, even if a defendant admitted being guilty of all the conduct the prosecutor alleged occurred, the allegedly criminal act would not amount to an offense because the statute does not prohibit it. See
 
 People v Bettistea,
 
 173 Mich App 106, 118; 434 NW2d 138 (1988).
 

 Cain apparently intends to argue that the contract
 
 irrefutably
 
 establishes Bergdahl’s consent to Cain’s taking of Bergdahl’s money and, therefore, the prosecution cannot satisfy its burden of proving lack of consent. Thus, she contends, it was legally impossible for her to commit this crime. However, she misconstrues the relative importance of the signed writing. Its mere existence did not remove her conduct from that described by the larceny statute. Rather, in light of the prosecution’s evidence of Bergdahl’s inability to grant consent, it created a factual dispute with regard to that issue and to Cain’s intent at the time of the taking.
 

 Although the signed writing entitled Cain to argue to the jury that it gave her a good-faith belief that she had a right to the money, which is a claim of right defense, neither the factual dispute regarding this issue nor the writing itself obligated the jury to find in her favor. Indisputably, “a jury may disbelieve the most positive evidence, even when it stands uncontradicted.”
 
 People v Jackson,
 
 390 Mich 621, 625, n 2; 212 NW2d 918 (1973), quoting
 
 Woodin v Durfee,
 
 46 Mich 424, 427; 9 NW 457 (1881). More to the point and in real contrast to the doctrine of legal impossibility, a claim of right defense arises when there is a dispute regarding a defendant’s felonious intent at the time of
 
 *119
 
 the taking. See
 
 People v Pohl,
 
 202 Mich App 203, 205-206; 507 NW2d 819 (1993), rev’d in part and remanded on other grounds 445 Mich 918 (1994);
 
 People v Karasek,
 
 63 Mich App 706, 710-711; 234 NW2d 761 (1975), quoting 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1799, pp 2144-2145, and
 
 People v Hillhouse,
 
 80 Mich 580; 45 NW 484 (1890). According to this defense, if a defendant had a good-faith belief that the defendant had a legal right to take the property at issue, then the defendant cannot be convicted because the defendant did not intend to deprive another person of property. See
 
 People v Goodchild,
 
 68 Mich App 226, 232; 242 NW2d 465 (1976) (“The felonious intent required for larceny,
 
 animus furandi,
 
 is an intent to permanently deprive the owner of his property.”). The defense applies even if the belief is mistaken or unreasonable.
 
 Hillhouse, supra
 
 at 586.
 

 These questions of intent and the honesty of belief inherently involve weighing the evidence and assessing the credibility of witnesses, which is a task for the jury. See
 
 Pohl, supra
 
 at 206;
 
 People v Wolfe,
 
 440 Mich 508, 514-515; 489 NW2d 748 (1992), quoting
 
 People v Palmer,
 
 392 Mich 370, 375-376; 220 NW2d 393 (1974). We cannot weigh the evidence for ourselves and determine if we would have reached the same result as the jury did in this case.
 
 Id.
 
 at 515, quoting
 
 People v Howard,
 
 50 Mich 239, 242; 15 NW 101 (1883). Rather, because asserting a claim of right defense will not secure an acquittal unless the jury believes the defense, we need only satisfy ourselves that there was sufficient evidence to prove every element of the
 
 *120
 
 offense beyond a reasonable doubt.
 
 [10]
 

 Daniels, supra
 
 at 665. We therefore pay close attention to the evidence of Cain’s felonious intent in light of her defense.
 

 The basic elements of larceny are
 

 (1) an actual or constructive taking of goods or property,
 

 (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, (5) the taking must be without the consent and against the will of the owner.
 
 [People v Anderson,
 
 7 Mich App 513, 516; 152 NW2d 40 (1967).]
 

 As noted above, the specific intent necessary to commit larceny is the intent to steal another person’s property.
 
 Goodchild, supra
 
 at 232. Additionally, the statute for the form of larceny charged in this case requires that the goods or property must be worth more than $100. MCL 750.356; MSA 28.588.
 

 Viewed in the light most favorable to the prosecution, Bjome’s testimony and the exhibits introduced during his testimony provide sufficient evidence of the first, second, and fourth elements of this offense as well as the value threshold for the property.
 
 People v Head,
 
 211 Mich App 205, 210; 535 NW2d 563 (1995);
 
 Anderson, supra
 
 at 516. Bjome described, in detail, how Cain took sums of money, all worth more than $100, owned by Bergdahl, and transferred them from
 
 *121
 
 Bergdahl’s accounts through a joint account into Cain’s own accounts or converted them into cash.
 

 The large amount of money at issue and the speed with which Cain took it is circumstantial evidence of an intent to permanently deprive Bergdahl of her property, as the third element of the offense requires.
 
 Id.
 
 at 516. Similarly, Cain failed to put into place any accounting system so that she could calculate what she would owe Bergdahl in order to repay her according to the terms of the purportedly valid agreement. This was strong evidence that Cain was not acting under the auspices of the writing (i.e., pursuant to a claim of right and with an innocent state of mind) when Cain took the money, regardless of her belief in the ultimate legal enforceability of the writing. If Cain had no way of determining how much money she took from Bergdahl, then it would be reasonable for the jury to infer that she never intended to repay it. Nor can we ignore Signs’ testimony that the writing may have originally consisted of additional pages of paper not available at trial, that she did not witness Bergdahl or Cain sign the writing, and that Cain asked her to write the wrong date next to her signature. These factors all suggest that Cain had a felonious intent at the time she started to take Bergdahl’s money. That Cain relied on this agreement to excuse every subsequent transaction at issue suggests that she retained this felonious intent with each additional act.
 

 Finally, in regard to the fifth element, there were literally days of trial testimony by Bergdahl’s friends, acquaintances, and physicians describing her mental deterioration.
 
 Id.
 
 at 516. Testimony that Cain discussed Bergdahl’s mental status with medical staff
 
 *122
 
 and inquired about guardianship before July 1991 suggests that Cain also questioned Bergdahl’s ability to make decisions for herself. Not only does that contradict Cain’s argument that she relied in good faith on Bergdahl’s consent, as evidenced by the writing, it also is relevant to the underlying question whether Bergdahl had the capacity to consent. When viewed in the light most favorable to the prosecution, this evidence certainly tended to prove that Bergdahl did not have the capacity to consent to the taking. Therefore, the record demonstrates that there was sufficient evidence to prove every element of the offense beyond a reasonable doubt.
 

 VI. EVIDENTIARY ISSUES
 

 A. CAIN’S ARGUMENT
 

 Cain argues that the trial court erred in preliminarily ruling that evidence of (1) her expunged conviction for welfare fraud, (2) her spending habits, and (3) Bergdahl’s competency at times other than July 30, 1991, would be admissible at trial. We address these claimed errors in turn.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 Cain raised each of these evidentiary issues in motions before trial, and the trial court ruled against her on each issue. Therefore, these issues are preserved for our review. MRE 103(a)(2). We review a trial court’s decision to admit evidence for an abuse of discretion.
 
 People v Starr,
 
 457 Mich 490, 494; 577 NW2d 673 (1998).
 

 
 *123
 
 C. EXPUNGED WELFARE FRAUD CONVICTION
 

 Cain argues that the trial court misapplied the four-pronged test for other acts evidence that the Michigan Supreme Court outlined in
 
 People v VanderVliet,
 
 444 Mich 52; 508 NW2d 114 (1993), when it decided that her welfare fraud conviction would be admissible at trial as relevant to her good-faith belief that she had a right to take Bergdahl’s money. As a result of this ruling, Cain claims, she chose not to testify. The prosecution ultimately did not introduce this evidence to the jury.
 

 We need not decide the merits of Cain’s argument because, even assuming that the trial court erred, the error was harmless under the standard for reversal announced in
 
 People v Lukity,
 
 460 Mich 484; 596 NW2d 607 (1999). In
 
 Lukity,
 
 the Court stated that “a preserved, nonconstitutional error is not a ground for reversal unless ‘after an examination of the entire cause, it shall affirmatively appear’ that it is more probable than not that the error was outcome determinative.”
 
 Id.
 
 at 496. Because this evidence never went to the jury, it could not be outcome determinative. A fair reading of
 
 Lukity,
 
 which discussed only the effect of evidence on a jury and not any effects of evidentiary errors on trial strategy, supports this conclusion.
 

 D. SPENDING PATTERNS
 

 According to Cain, the trial court erred in admitting evidence at trial of how she spent Bergdahl’s money. Cain claims that the testimony that she, for instance, refurbished her home, took trips, and gave gifts with Bergdahl’s money was irrelevant to her intent to permanently deprive Bergdahl of the money because
 
 *124
 
 those activities occurred
 
 after
 
 she took the money. We agree that the prosecution had to show that Cain intended to permanently deprive Bergdahl of the money at the time she took it and evidence of subsequent intent would be insufficient to prove larceny. See
 
 People v Gimotty,
 
 216 Mich App 254, 257-258; 549 NW2d 39 (1996) (“Larceny is the taking and carrying away of the property of another,
 
 done with
 
 felonious intent and without the owner’s consent.”) (emphasis added).
 

 Nevertheless, given Cain’s de facto control over Bergdahl’s finances and court-ordered fiduciary relationship with Bergdahl as her guardian, the evidence was admissible to show the necessary felonious intent to permanently deprive Bergdahl of the money.
 
 Id.
 
 at 257. In other words, this evidence
 
 [11]
 
 distinguished the allegedly larcenous financial transactions at issue from the other legitimate financial transactions where Cain took money from Bergdahl’s accounts to spend for Bergdahl’s benefit. Additionally, in light of Cain’s decision to commingle her personal funds with Bergdahl’s money, the evidence that her spending habits became more liberal after she had access to Bergdahl’s money was relevant to prove asportation.
 
 Id.
 
 Although this evidence was circumstantial, it was relevant to demonstrate that Cain took and carried away Bergdahl’s money, which was necessary to prove larceny. Therefore, this evidence was admissible.
 

 
 *125
 
 E. LIMITING EVIDENCE OF COMPETENCY
 

 Cain contends that the trial court had an obligation to limit the evidence of Bergdahl’s competency to July 30, 1991, when Cain purportedly signed the loan agreement and established her claim of right defense. We disagree. As noted above, the jury, sitting as the factfinder in this case, was at liberty to reject Cain’s argument that she had a good-faith belief that the agreement evidenced Bergdahl’s consent to give her money. As a result, the prosecution was entitled to support its theory that Bergdahl was incapable of giving consent to Cain to take money
 
 each time
 
 Cain did so because Bergdahl was incompetent.
 
 [12]
 

 VH. JURY INSTRUCTIONS REGARDING COMPETENCY
 

 A. CAIN’S ARGUMENT
 

 The record reveals that, despite a significant amount of pretrial discussion as well as numerous motions and memoranda suggesting that the trial court intended to define competency for the jury, the trial court ultimately failed to give a specific instruction regarding competency at the end of the trial. Instead, the trial court addressed Bergdahl’s competency in the context of summarizing each party’s theory of the case, saying:
 

 [I]t is the theory and claim of the prosecution . . . that at the time this property was taken from Marguerite Bergdahl at these various times during this two year period . . . that
 
 *126
 
 Marguerite Bergdahl did not give consent to have her property taken, in that she was not competent to consent to that kind of property [sic], that she wasn’t aware of what her assets were, her future needs, her various options and choices, that her memory as to recent events was poor. And the prosecution further claims that this is a continuing transaction, and, therefore, the competence or consent of the defendant must be examined at the time of these various transactions.
 

 The trial court explained that Cain’s theory of the case was that Bergdahl exhibited “behavior [that] was at least outwardly normal, and that she was competent to give consent at the time the joint accounts were first established, and that is when the defendant gained control over those particular funds.” Further, “the defendant submits that even if Marguerite Bergdahl in fact wasn’t competent, that the defendant believed honestly that she was [competent] . . .
 

 Cain argues that merely relaying the parties’ theories of the case was insufficient and that the only proper instruction regarding competency for this case comes from
 
 In re Erickson Estate,
 
 202 Mich App 329, 332; 508 NW2d 181 (1993), where we said:
 

 The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which the person is engaged. To avoid a contract it must appear not only that the person was of unsound mind or insane when it was made, but that the unsoundness or insanity was of such a character that the person had no reasonable perception of the nature or terms of the contract.
 

 This definition of competency to contract is consonant with Cain’s theory that merely establishing the existence of a signed writing, which she contends is a
 
 *127
 
 contract, entitles her to acquittal. Nevertheless, we conclude that the omission of a special instruction regarding competency, whether from
 
 In re Erickson
 
 or other authority, does not require reversing Cain’s conviction.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 Cain did not object to the omission of a competency instruction before the jury commenced its deliberations, even though an objection is ordinarily necessary to preserve an instruction issue for appellate review. See
 
 People v Smith,
 
 80 Mich App 106, 113; 263 NW2d 306 (1977). However, at oral arguments in this appeal we raised this issue and subsequently granted the parties leave to file supplemental briefs addressing whether the trial court’s failure in this regard constituted an error requiring reversal. As we said in
 
 Paschke v Retool Industries (On Rehearing),
 
 198 Mich App 702, 705; 499 NW2d 453 (1993), rev’d on other grounds 445 Mich 502; 519 NW2d 441 (1994), “The court is
 
 obligated
 
 only to review issues that are properly raised and preserved; the court is
 
 empowered,
 
 however, to go beyond the issues raised and address any issue that, in the court’s opinion, justice requires be considered and resolved.” As a result, we reach the merits of this question.
 

 This Court reviews jury instructions as a whole to determine if the trial court made an error requiring reversal.
 
 People v Caulley,
 
 197 Mich App 177, 184; 494 NW2d 853 (1992). “Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant’s rights.”
 
 People v Daniel,
 
 207 Mich App 47, 53; 523 NW2d 830 (1994).
 

 
 *128
 
 The critical flaw in Cain’s argument is that she implicitly elevates the concept of competency to an element of the crime charged, for which the courts must be especially careful to instruct the jury with regard to a legal definition in order to protect a defendant’s right to a fair trial. See
 
 People v Rone (On Second Remand),
 
 109 Mich App 702, 712-713; 311 NW2d 835 (1981). As we have said more than once in this opinion, competency is not an element of larceny over $100, MCL 750.356; MSA 28.588. It was merely the prosecution’s theory that it could demonstrate at least one of the elements of the crime, failure to consent to the taking and carrying away, with evidence of Bergdahl’s incompetency. As a result, it was sufficient for the trial court to submit this competency issue to the jury as the prosecution’s theory.
 

 Furthermore, the summary of this theory that the trial court actually gave to the jury and the definition of competence in
 
 In re Erickson, supra
 
 at 332, would both logically lead the jury down the same path of analysis. That is, the factors relevant to competency that the trial court enumerated essentially asked the jury to determine if Bergdahl was of “sufficient mind to understand in a reasonable manner the nature and effect of the act” of signing the agreement.
 
 Id.
 
 In the absence of any errors in the instructions relevant to the elements of the crime, the trial court adequately discharged its obligation to instruct the jury with regard to the remaining “material issues, defenses, and theories” supported by the evidence.
 
 Daniel, supra
 
 at 53. Critically, if the trial court erred in failing to issue an instruction regarding competence, we know that the error did not affect the jury’s decision,
 
 *129
 
 because the jurors agreed that a transaction that occurred specifically
 
 after
 
 the probate court adjudged Bergdahl incompetent was the basis for the conviction.
 

 Vm. SENTENCING
 

 A. CAIN’S ARGUMENT
 

 Cain argues that her sentence, which she has yet to serve, is invalid. She challenges her sentence in two respects. First, she contends that the trial court miss-cored offense variable (ov) 8 under the nonstatutory sentencing guidelines in effect when the trial court sentenced Cain. Second, she argues that the sentence, which is a substantial upward departure from the minimum sentence range recommended by the sentencing guidelines, is disproportionately severe. We disagree with both contentions.
 

 B. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW
 

 Cain preserved the alleged scoring error for our review by objecting at the sentencing hearing. MCR 6.429(C). She did not need to take any special steps to preserve the question of the proportionality of her sentence and properly presented it for appeal by providing this Court with a copy of the presentence investigation report. MCR 7.212(C)(7);
 
 People v
 
 Oswald, 208 Mich App 444, 446; 528 NW2d 782 (1995).
 

 “Appellate review of guidelines calculations is limited, and a sentencing court has discretion in determining the number of points to be scored provided there is evidence on the record that adequately sup
 
 *130
 
 ports a particular score.”
 
 People v Dilling,
 
 222 Mich App 44, 54; 564 NW2d 56 (1997). Similarly, we review the sentence imposed for an abuse of discretion.
 
 People v
 
 Albert, 207 Mich App 73, 74; 523 NW2d 825 (1994). “[A] given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.”
 
 People v Milbourn,
 
 435 Mich 630, 636 461 NW2d 1 (1990).
 

 C. SCORING OF OV 8
 

 Ov 8 for larceny offenses is entitled “continuing pattern of criminal behavior.” Michigan Sentencing Guidelines (2d ed), p 84. Under this offense variable, the trial court can score ten points if “[t]he offense is a part of a pattern of criminal activities over a period of time from which the offender derives a substantial portion of his or her income and/or the offense is directly related to membership in an organized criminal group.”
 
 Id.
 
 The trial court can assess a defendant zero points if there was “[n]o continuing criminal behavior and/or membership in an organized criminal group.”
 
 Id.
 
 The trial court in this case assessed Cain ten points, which she apparently argues is erroneous because the prosecutor did not prove a continuing course of criminal conduct by a preponderance of the evidence. Although Cain does not clearly make this argument on appeal, at sentencing she said this score was improper because the jury found her guilty of only a single act of larceny occurring in December
 
 *131
 
 1992 and did not find her guilty of larceny for any of the other transactions.
 

 In
 
 People v Raby,
 
 456 Mich 487, 496-497; 572 NW2d 644 (1998), the Michigan Supreme Court affirmed the principles outlined in
 
 People v Mitchell,
 
 454 Mich 145, 177; 560 NW2d 600 (1997), which said that a sentence must be overturned and new sentencing ordered only when, “(1) a factual predicate is wholly unsupported, (2) a factual predicate is materially false, and (3) the sentence is disproportionate.” Cain’s argument is, in effect, that the record does not support a continuing course of conduct under this second factor. We wholly disagree. There was extensive documentary evidence at trial that Cain’s pattern of criminal conduct extended over at least two years, supporting this score. Thus, Cain is not entitled to resentencing on the basis of this issue.
 

 D. SENTENCING PROPORTIONALITY
 

 Cain argues that her minimum two-year prison sentence, which is more than
 
 2}k
 
 times higher the minimum nine-month sentence recommended by the guidelines, is disproportionately severe. At sentencing, the trial court commented that it appreciated that this case presented a complex situation, and that there were both positive and negative factors relevant to its decision. In Cain’s favor, the trial court recognized that she did care for Bergdahl and that a number of witnesses and friends who wrote on her behalf before sentencing believed her to be a valuable and contributing member of the community. Nevertheless, the trial court concluded that it had “absolutely” no doubt that she intentionally took the money knowing
 
 *132
 
 that she did not have the right to do so. Furthermore, the trial court noted that ov 17
 
 [13]
 
 permits ten points, the highest number of points available, for taking more than $5,000 but this case involved an amount
 
 forty
 
 times higher than that threshold. See Michigan Sentencing Guidelines (2d ed), p 84. The trial court cited this last factor as the reason for its upward departure from the guidelines.
 

 Even though sentences that depart from the sentencing guidelines are subject to careful scrutiny on appeal,
 
 People v Coulter (After Remand),
 
 205 Mich App 453, 456; 517 NW2d 827 (1994), “the ‘key test’ of proportionality is not whether the sentence departs from or adheres to the recommended range, but whether it reflects the seriousness of the matter.”
 
 People v Houston,
 
 448 Mich 312, 320; 532 NW2d 508 (1995). This was a serious offense perpetrated against a helpless victim who was, in the end, deprived of almost all her savings. Bergdahl’s conservator, once appointed by the probate court, had to sell Bergdahl’s house just to pay for her nursing home expenses. Like the trial court, we cannot say that Cain simply made a mistake or that her otherwise good-hearted nature outweighed her greed. There is a considerable difference between taking $5,000 and the $250,000 Cain took from Bergdahl. As a result, we agree that ov 17 does not adequately address the circumstances of this case. There was no abuse of discretion in the trial court’s reasoning at the sentencing hearing or in the actual sentence that it imposed.
 
 [14]
 

 
 *133
 
 IX. CONCLUSION
 

 In summary, we hold that (1) the prearrest delay in this case was not prejudicial, (2) the pretrial delay did not violate the constitutional guarantee of a speedy trial, (3) the trial court did not err in permitting the prosecution to charge Cain with a single offense and introduce evidence of multiple acts of wrongdoing, (4) the written agreement did not make Cain’s conviction legally impossible, (5) the trial court did not commit any evidentiary errors warranting reversal, (6) the trial court did not err in failing to issue a specific competency instruction to the jury, and (7) the trial court neither misscored the sentencing guidelines nor abused its discretion by imposing a sentence that is an upward departure from the recommendation under the guidelines.
 

 Affirmed.
 

 Markman, J. did not participate.
 

 [1]
 

 At the time of the offense in this case, before the Legislature passed 1998 PA 301, this statute read:
 

 Any person who shall commit the offense of larceny, by stealing, of the property of another, any money, goods or chattels, or any bank note, bank bill, bond, promissory note, due bill, bill of exchange or other bill, draft, order or certificate, or any book of accounts for or concerning money or goods due or to become due, or to be delivered, or any deed or writing containing a conveyance of land, or any other valuable contract in force, or any receipt, release or defeasance, or any writ, process or public record, if the property stolen exceed the value of $100.00, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by fine of not more than $2,500.00. If the property stolen shall be of the value of $100.00 or less, such person shall be guilty of a misdemeanor.
 

 [2]
 

 Bergdahl died in October 1996, before the trial in this case.
 

 [3]
 

 Roger Bergdahl evidently did not tell Bergdahl that he saved a substantial amount of money during his lifetime.
 

 [4]
 

 William Trebilcock eventually rejected the power of attorney because of concerns about his own age and health and how those factors might affect his ability to carry out the responsibilities under the power of attorney agreement.
 

 [5]
 

 5 Cain started a bridal consulting and balloon business.
 

 [6]
 

 Cain apparently adopted this somewhat miserly approach to spending Bergdahl’s money for Bergdahl’s benefit only after gaining direct access to the bank accounts and other liquid assets, as if it were her money. For instance, after Bergdahl went home from the hospital in June 1991, Cain asked Connie Brewer to take care of Bergdahl for three days. At the end of the three days Cain offered to pay Brewer for her efforts. Brewer declined, she explained, because Bergdahl’s modest home gave her the impression that she was poor. Cain insisted on paying her, reportedly saying, “the f.....g bitch was loaded.”
 

 [7]
 

 Although the foreperson did not mention the value of the certificate of deposit that the jurors agreed constituted the offense, it was likely a $6,799.44 certificate of deposit Cain cashed in December 1992. We note that Bergdahl’s least valuable certificate of deposit was worth $1,634. Consequently, even if we thought there was a possibility that the jury agreed on a transaction involving a different certificate of deposit, it would still pass the $100 threshold for this larceny offense. MCL 750.356; MSA 28.588.
 

 [8]
 

 For example, the prosecution drafted a bill of particulars to list every transaction at issue.
 

 [9]
 

 Legal impossibility most frequently arises as a defense to an attempted crime where only the completed act is a criminal offense. See
 
 People v Tinskey,
 
 394 Mich 108, 108; 228 NW2d 782 (1975). As an illustration of this doctrine, see
 
 People v Genoa,
 
 188 Mich App 461, 470 NW2d 447 (1991). In
 
 Genoa,
 
 the prosecutor charged the defendant with attempted possession with intent to deliver 650 grams or more of cocaine, MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i), on the basis of evidence that he agreed to pay an undercover agent of the Michigan State Police $10,000 to purchase and resell a kilogram of cocaine for a profit.
 
 Genoa, supra
 
 at 462-463. The defendant handed over the money to the agent, who immediately turned it over to the police without ever possessing cocaine.
 
 Id.
 
 at 463. Indeed, there was no evidence that the police or the agent ever intended to possess cocaine.
 
 Id.
 
 The only logical theory under which the prosecutor could proceed was that the defendant attempted to aid and abet the charged crime.
 
 Id.
 
 Nevertheless, the defendant could not be convicted of aiding and abetting the offense of possession with intent to deliver cocaine when there was no evidence that he or any other person possessed cocaine with the intent to deliver it, an essential element of the crime.
 
 Id.
 
 at 463-464. Furthermore, the statute did not make funding an imaginary drug deal a crime, no matter how earnestly the defendant wanted to assist the agent with an actual narcotics transaction.
 
 Id.
 
 at 464. As a result, it was legally impossible to convict the defendant of the charged offense.
 

 [10]
 

 It is important to note that this claim of right defense merely creates a question of fact for the jury and does not establish an affirmative defense, which would then require the prosecution to prove that Cain
 
 was not
 
 acting under a good-faith belief in a claim of right. See
 
 People v Sorscher,
 
 151 Mich App 122, 131-132; 391 NW2d 365 (1986).
 

 [11]
 

 Bjome was able to trace specific transactions involving Bergdahl’s accounts to purchases by Cain.
 

 [12]
 

 We emphasize that this case does not come down to contract construction. If it did, Cain’s argument would have even less merit because, even from our casual inspection, the agreement would likely not be binding on the parties because it lacks consideration, reciting only Cain’s past performance as the benefit Bergdahl received in exchange for the money. See
 
 Shirey v Camden,
 
 314 Mich 128, 138; 22 NW2d 98 (1946).
 

 [13]
 

 The trial court mistakenly referred to ov 17 as ov 8.
 

 [14]
 

 We find it interesting that the Legislature doubled the maximum sentence under MCL 750.356; MSA 28.588 to ten years in prison for larceny of $20,000 or more in the 1998 amendments. Although these amendments do
 
 *133
 
 not guide our decision with regard to this issue, this change in the statutory scheme suggests that Cain’s offense is still among the most severe.