*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CURTIS JOHNSON,

        Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 361267
Wayne Circuit Court
LC No. 19-004594-01-FC

Before: GLEICHER, C.J., and GARRETT and MALDONADO, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of felony murder, MCL 750.316(1)(b), first-degree premeditated murder, MCL 750.316(1)(a), armed robbery, MCL 750.529, being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and four counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to serve life imprisonment without the possibility of parole for both murder convictions, but it then vacated the premeditated murder conviction and sentence on double-jeopardy grounds. Defendant was also sentenced to 25 to 40 years' imprisonment for armed robbery, two to five years' imprisonment for felon-in-possession, and two years' imprisonment for each felony-firearm count. We affirm.

## I. BACKGROUND

This case arises from the murder of a taxi driver. The victim was shot twice in the head during the early morning hours of May 25, 2019. He was discovered lying on the ground outside his taxi, with the pockets of his pants turned inside out. The victim's wallet was never found, suggesting that the motive for the shooting was a robbery. Two witnesses saw a person moving away from the taxi moments after the shooting occurred, but neither could offer more than a generalized physical description. Defendant became a suspect in the shooting because his address remained on the taxi's meter, and records from the taxi company indicated that the victim's last run was in response to a request for service at that address. Additionally, at the time of defendant's arrest, he was carrying the cell phone that was used to request the taxi service on the night in question.

The police executed a search warrant at defendant's residence and discovered a pair of shoes; the left shoe had what was later confirmed to be drop of blood on it. During his interrogation, defendant admitted that the shoes belonged to him, but claimed that the drop of blood was likely left there when he was assaulted earlier in the evening on May 24, 2019. Defendant insisted that he remained at home all night after the assault and specifically denied any knowledge regarding the shooting or reason to be in the area where it occurred. Although most of the evidence submitted for DNA testing contained DNA from too many contributors to allow comparison, an expert testified that there was very strong support to conclude that the blood on defendant's shoe came from the victim.

Defendant was found guilty as described above, and this appeal followed.

## II. SPEEDY TRIAL

Defendant argues that his convictions should be reversed on the basis of a speedy trial violation because his jury trial did not commence until nearly 29 months after his May 2019 arrest. We disagree.

Defendant failed to preserve this issue for appellate review because he did not make a formal demand for trial. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Unpreserved claims of constitutional error are reviewed under the plain-error rule.[1] *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020). "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights." *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (quotation marks and citation omitted). "An error affects substantial rights when it impacts the outcome of the lower-court proceedings." *Id*. (quotation marks and citation omitted). Moreover, reversal based on an unpreserved error "is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence." *Id*. (quotation marks and citation omitted).

The right to a speedy trial in criminal prosecutions is guaranteed by both the United States Constitution and 1963 Michigan Constitution. *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006), citing US Const, Am VI, and Const 1963, art 1, § 20. Michigan courts apply the four-

---

[1] The prosecution seems to suggest that failure to assert the right to a speedy trial before the trial court should preclude appellate relief even under the more demanding plain-error rule. This position lacks merit because it is at odds with the test governing speedy trial claims, which considers "the defendant's assertion of the right" as one of four relevant factors. See *People v Williams*, 475 Mich 245, 261-262; 716 NW2d 208 (2006) (describing four-part test). Indeed, in establishing the test that continues to govern these issues, the United States Supreme Court explicitly rejected a proposed rule under which "a defendant who fails to demand a speedy trial forever waives his right." *Barker v Wingo*, 407 US 514, 528; 92 S Ct 2182; 33 L Ed 2d 101 (1972). Although it is certainly prudent to raise this issue before the trial court, failure to do so does not preclude review under the plain-error rule.

part test from *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972), to determine whether a defendant's constitutional right to a speedy trial has been violated. *Williams*, 475 Mich at 261. Under the *Barker* test, this Court balances for factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. No single factor is "either a necessary or sufficient condition to" a meritorious speedy-trial claim. *Barker*, 407 US at 533. Rather, courts must "engage in a difficult and sensitive balancing process." *Id*.

## A. LENGTH OF DELAY

When determining the length of the delay for purposes of the first *Barker* factor, the relevant time period begins at the time of the defendant's arrest. *Williams*, 475 Mich at 261. Prejudice is presumed after "a delay of eighteen months or more." *Id*. at 262. Defendant was arrested on May 29, 2019, and his trial began on October 20, 2021, just shy of 29 months later. A delay of this length is presumptively prejudicial and requires this Court to consider the remaining *Barker* factors. *Id*. at 262. The first factor weighs in defendant's favor.

## B. REASON FOR DELAY

While the pandemic played a role in the length of the delay, the delay is primarily attributable to the prosecution; therefore, this factor weighs in defendant's favor.

When "assessing the reasons for the delay, this Court must examine whether each period of delay is attributable to the defendant or the prosecution." *People v Waclawski*, 286 Mich App 634, 666; 780 NW2d 321 (2009). Delays that are unexplained should be attributed to the prosecution, as well as delays caused by docket congestion. *Id*. With respect to the latter category, however, "delays inherent in the court system . . . are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citations omitted).

Before addressing the history of and reason for the various delays in this case, we note that the delays involving pandemic-related closures are not a matter of record. Defendant repeatedly cites press releases from the trial court and other news articles, but defendant is not allowed to expand the record on appeal, *People v Morrison*, 328 Mich App 647, 655; 939 NW2d 728 (2019), and this Court has previously indicated that newspaper articles are not an appropriate subject of judicial notice because of hearsay concerns, *People v McKinney*, 258 Mich App 157, 161 n 4; 670 NW2d 254 (2003). As such, we cannot rely on any dates identified in defendant's proffered news articles to decide this issue. Conversely, we will take judicial notice of the trial court's press releases pursuant to MRE 201 which permits a court to take judicial notice of an "adjudicative fact," MRE 201(a), as long as it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," MRE 201(b). That the court system experienced significant operating difficulties occasioned by the COVID-19 pandemic is generally known throughout Michigan, and the periods during which the trial court was not holding criminal trials can be accurately determined from the court's own press releases, at least to the extent those periods were reported by the trial court. Moreover, we note

that this will not be the first time an appellate court takes judicial notice of matters involving court operations. See, e.g., *People v Snow*, 386 Mich 586, 589-591; 194 NW2d 314 (1972) (rejecting challenge to appellate court's reliance on affidavit regarding disposition of all cases in a single court over 26-month period when same data could have been "judicially noticed under the 'one court of justice' doctrine"); *In re Henry*, 369 Mich 347, 363; 119 NW2d 671 (1963) (taking judicial notice that trial court had multiple judges).

Although there does not to be any binding caselaw addressing how pandemic-related delays affect speedy-trial issues, this Court has considered the matter in the context of the related 180-day rule set forth in MCL 780.131. *People v Witkoski*, 341 Mich App 54; 988 NW2d 790 (2022). In *Witkoski*, this Court noted that much of the delay in prosecuting the defendant was caused by the suspension of jury trials during the pandemic, which it deemed analogous to the delay caused by a change in docketing system at issue in *People v Schinzel (On Remand)*, 97 Mich App 508, 512; 296 NW2d 85 (1980),[2] another case involving the 180-day rule. *Id*. at 63. The significance of this observation and the *Witkoski* Court's adoption of the *Schinzel* Court's reasoning is more apparent upon examination of the opinion in *Schinzel*. In that case, trial delays arose when the trial court adopted a central docketing system for several months only to return to its previous system when the new system proved ineffective. *Schinzel*, 97 Mich App at 512. This Court explained that delays from chronic docket congestion are ordinarily treated as inexcusable, while "[a] delay which results from short-term docket congestion, attributable to exceptional circumstances which hamper the normally efficient functioning of the trial court, constitutes an excusable delay." *Id*. at 511-512. Because the change in docketing system was an exceptional and unavoidable circumstance, the Court held that it was excusable and did not violate the 180-day rule. *Id*. at 512-513. By citing *Schinzel* as persuasive authority, this Court implicitly cast the pandemic-related delays as an exceptional circumstance that should be treated as excusable for purposes of the 180-day rule. *Witkoski*, 341 Mich App at 63. Characterization of pandemic-related delays as excusable is significant in the context of a speedy-trial claim as well because valid, justifiable reasons for a delay are not to be attributed to the government. *Barker*, 407 US at 531. See also *United States v Loud Hawk*, 474 US 302, 316; 106 S Ct 648; 88 L Ed 2d 640 (1986) (reasoning that a prosecutorial appeal advancing a strong and ultimately successful claim of error should not be given "effective weight" in a speedy trial claim). In accord with *Witkoski* and *Schinzel*, we likewise view the delay caused by the pandemic-related restrictions on court operations as excusable and decline to include that period in our calculation of the length of delay attributable to the prosecution.[3]

Returning to the second *Barker* factor, defendant's trial was originally scheduled for October 7, 2019, 131 days after his arrest. While this is not an unusual delay, it must be attributed to the prosecution, but only given minimal weight. *Williams*, 475 Mich at 263. At a final

---

[2] Opinions from the Court published before November 1, 1990, are not binding but "are entitled to deference under traditional principles of stare decisis and should not be lightly disregarded." *People v Haynes*, 338 Mich App 392, 414 n 1; 980 NW2d 66 (2021).

[3] Although defendant suggests that the postpandemic resumption of jury trials in the trial court took an unreasonable length of time in comparison to other circuit courts throughout the state, there is no record evidence to support such a conclusion.

-4-

conference on September 26, 2019, the trial court agreed to change the October 7, 2019 trial date to a pretrial conference. Two reasons for the trial adjournment are identified in the record: (1) the prosecution had a scheduling conflict and (2) the police needed to vet information defendant had provided that might affect the outcome of the proceedings. Although the nature of that information was not identified on the record at the conference, a later document explained that defendant provided a proffer statement implicating someone else in the murder shortly before the initial trial date. When the parties appeared for the October 7, 2019 pretrial, the prosecution advised the court that it had yet to resolve the issue discussed at the previous hearing, i.e., the proffer statement. Moreover, the prosecution had learned that necessary DNA testing had not yet begun because the crime laboratory was unaware of the original trial date, and it would take approximately 60 days to complete the testing. As such, the case could not proceed to trial before the beginning of December 2019. The trial court proposed that trial begin on December 4, 2019, but the prosecution was not available on that date. The prosecution proposed that the trial begin December 16, 2019, but defense counsel was not available then. With those dates eliminated, the trial court indicated that the trial could not take place until January 2020, and it was agreed that trial would begin January 27, 2020. The period between the original October 7, 2019 trial date and the new trial date first proposed by the prosecution was 70 days. Inasmuch as the adjournment was requested by the prosecution on the basis of scheduling conflicts and unresolved investigative issues, it should be attributed to the prosecution. The 42-day period from December 16, 2019, until the first available trial date in January 2020, however, was caused by defense counsel's unavailability and should be attributed to defendant. The register of actions indicates that a pretrial was conducted on January 14, 2020, but no transcript of that proceeding is available because the proceeding apparently went unrecorded. While there is no evidence of what occurred on January 14, 2020, this Court can infer that the trial was adjourned on that date, as it clearly did not take place on January 27, 2020. Instead, the trial next appears on the register of actions as being scheduled for April 27, 2020. Because the reason for this 91-day delay is unexplained, it must be attributed to the prosecution. *Waclawski*, 286 Mich App at 666.

At this point, analysis of defendant's speedy-trial claim becomes complicated by the COVID-19 pandemic and the poor recordkeeping that arose in the wake of the state of emergency declared by Michigan's governor on March 10, 2020. Notably, our Supreme Court entered an administrative order on March 18, 2020, formally halting all jury trials until after April 3, 2020. Administrative Order No. 2020-2, 505 Mich cii (2020). The date on which jury trials could resume was extended through a series of subsequent orders, with the final order requiring the suspension of jury trials until further order.[4]

Defendant's April 27, 2020 trial plainly could not take place as scheduled, through no fault of the parties. Jury trials apparently resumed in the trial court the week of September 21, 2020, so

---

[4] See Administrative Order No. 2020-5, 505 Mich cxxx (2020) (extending until April 14, 2020); Administrative Order No. 2020-7, 505 Mich cxxxiv (2020) (extending until April 30, 2020); Administrative Order No. 2020-12, 505 Mich cxlii (2020) (extending until further order). See also Administrative Order No. 2020-10, 505 Mich cxxxix (2020) (halting jury trials until the later of June 22, 2020, or a deadline imposed by local order).

jury trials could not be conducted during that 127-day period when they had been halted. Trials had to be stopped again effective November 3, 2020, because of a reemergence of high rates of COVID-19 infections.[5] Because the record has no explanation for why defendant's trial was not conducted during this 63-day period when trials resumed, this delay is attributed to the prosecution. We have not been able to determine precisely when jury trials resumed again in the trial court, but the case was designated as trial ready in the register of actions on June 28, 2021—237 days after they were again halted. We attribute these 237 days to the pandemic because, even when doing so, the prosecution overwhelming bears responsibility for the bulk of the delays. Defendant's trial did not begin until October 20, 2021, 114 days after the case was deemed ready for trial in the register of actions; this unexplained delay is attributed to the prosecution.

In sum, 875 days elapsed between defendant's arrest and his trial: 469 days (53.6%) were attributable to the prosecution, 364 days (41.6%) were attributable to the pandemic, and 42 days (4.8%) were attributable to the defense. Because the majority of the delay could be attributed to the prosecution, this factor does weigh in defendant's favor.

## C. DEFENDANT'S ASSERTION OF THE RIGHT

The third *Barker* factor, on the other hand, weighs heavily against defendant because he did not raise the right to a speedy trial in the circuit court. *Williams*, 475 Mich at 263 (concluding that trial court did not clearly err by weighing this factor heavily against a defendant who did not assert the right until the day before trial). See also *Barker*, 407 US at 532 ("We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."). In fact, he was conspicuously silent on the matter on both occasions that it was mentioned, albeit in passing, by the trial court.

## D. PREJUDICE

This factor weighs heavily against defendant because, while the emotional toll of a lengthy pretrial detention is undeniable, there is nothing in the record suggesting that his defense was in any way impacted by the delay.

Turning to the final *Barker* factor, Michigan recognizes "two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). Prejudice to the person occurs from "pretrial incarceration leading to anxiety and concern." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). Defendant emphasizes that the personal prejudice an accused individual normally experiences during pretrial incarceration was exacerbated by the pandemic and the heightened risk of contracting COVID-19 in a jail setting. The prosecution opines that increased anxiety during the pandemic was not unique to prisoners, but does not seriously dispute that the

---

[5] Wayne Circuit Court, *Hitting the Pause Button on Jury Trials, Bench Trials, and Evidentiary Hearings* <https://www.3rdcc.org/press-releases/2020/11/03/PR_HittingthePauseButtononJuryTrialsBenchTrialsEvidentiaryHearings> (accessed October 5, 2023).

pandemic conditions likely increased the personal prejudice typically experienced during a lengthy pretrial incarceration. At any rate, prejudice is presumed when the pretrial delay exceeds 18 months, and the burden shifts to the prosecution to demonstrate a lack of prejudice. *Id*. at 695. Moreover, given the commonly-known inability of one to isolate oneself while incarcerated, it is hard to dispute that the anxiety of pretrial detention was heightened by the pandemic.

Nevertheless, it is well settled that prejudice to the defense is the more serious form of prejudice with respect to the final *Barker* factor. *Barker*, 407 US at 532; *Williams*, 475 Mich at 264. The reason for this understanding is straightforward: when pretrial delays inhibit a defendant's defense, it "skews the fairness of the entire system." *Barker*, 407 US at 532; *Williams*, 475 Mich at 264 (quotation marks and citation omitted). By way of example, the defense may be impaired by the death or disappearance of a witness or the fading of memory that naturally occurs over time. *Barker*, 407 US at 532.

Defendant argues that his defense was severely prejudiced because Terren Smith did not testify. Smith called 911 after the taxi crashed and told the operator that she saw a man walking away from the taxi after the crash. She indicated that the person was tall, dark-skinned, slim, and was wearing a black jacket and black hat. She also noted that someone else might be in the taxi still, as people outside were yelling for someone to call 911. The recording of Smith's 911 call was played at the trial, but she did not appear in court to testify despite having been given a subpoena. Defendant argues that if Smith had testified she would have been impeached regarding the fact that she could not identify defendant as the person who left the vehicle, and she could have been impeached regarding variations between her description and the descriptions offered by the other eyewitness.[6]

There are multiple problems with defendant's argument. Nothing in the record supports his contention that the delay played any role in Smith's failure to testify. Detective Drew Smith testified about Terren Smith's willingness to cooperate:

> *Q*. On a scale of 1 to 10, 1 being the lowest, 10 being the highest, how would you gauge Ms. Smith's level of cooperation?

> *A*. I would gauge it probably a 3. In the beginning, she was cooperative. As the case started going and court started coming up, she was uncooperative.

If anything, Detective Smith's testimony that Terren Smith ceased cooperating when "the case *started* going" and when "court *started* coming up" suggests that her reluctance began early in the process, before a significant time elapsed with defendant's trial beginning.

---

[6] Defendant also makes a remark in his brief asserting that he and Smith had a "longstanding relationship," so the fact that she did not identify him was of great importance. However, there is nothing in the record suggesting that these two knew each other, defendant's offhand remark regarding their "longstanding relationship" included no citations to the record or other sources, and there was no expansion upon the nature of their alleged relationship. Therefore, we pay this statement no regard.

Moreover, we are not persuaded that Smith's failure to testify caused defendant any harm; the fact that Smith could not identify defendant and that her description did not perfectly align with that of the other eyewitness could be established with the 911 call. Defendant emphasizes the fact that the jury would have been confronted with the fact that Smith could not make an in-court identification if she had testified. However, the 911 call indicates that Smith saw through her window after 1:00 a.m. that a man exited the taxi and walked away from it, and she did not give a particularly detailed description of the man. Therefore, the jury could likely surmise on its own that Smith could not have identified defendant as the man she saw if she had testified. Moreover, the other eyewitness, who did testify, was unable to identify defendant as the man he saw, but the jury nevertheless found defendant guilty. The primary evidence tying defendant to the crime was not the eyewitness testimony but the fact that defendant was in possession of the phone that had summoned the taxi and the fact that the police found a drop of the victim's blood on defendant's shoe. Defendant had no apparent connection with the victim, such that his involvement in the murder was the only likely explanation for the victim's blood appearing on defendant's shoe. This key evidence was available less than seven months after defendant's arrest and would likely have been decisive in any trial occurring after that point. There is no indication that the passage of time prevented defendant from somehow undermining this evidence.

In sum, although the delay certainly caused mental and emotional distress to defendant, this factor weighs heavily against him because the delay did not cause any harm to his defense.

## E. BALANCING THE FACTORS

Balancing the sum total of these factors, defendant has not demonstrated that he is entitled to appellate relief, particularly when viewed within the framework of plain error. Some of the *Barker* factors do favor defendant to some extent, but they simply do not demonstrate a clear or obvious deprivation of the right to a speedy trial. *Burkett*, 337 Mich App at 635. Even if a plain error could be discerned on this record, defendant's speedy-trial claim undoubtedly fails on the prejudice prong of the plain-error rule. As discussed in detail in the preceding section, defendant has presented no basis upon which to conclude that his trial would have been in any way different if the trial had promptly proceeded. With these circumstances, we cannot conclude that the lengthy delay in this case affected the outcome of the proceedings as is required to obtain plain-error relief. *Id*.

In conclusion, defendant has failed to establish that he is entitled to reversal of his convictions based on a speedy-trial violation.

## III. PROSECUTORIAL MISCONDUCT

Defendant raises three distinct claims of prosecutorial misconduct, each of which are without merit.

Defendant did not preserve his claims of prosecutorial misconduct for review by lodging a contemporaneous objection and requesting a curative instruction.[7] *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021). We review unpreserved claims of prosecutorial misconduct under the same plain-error rule described in Part II of this opinion. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (citation omitted). Unpreserved claims of prosecutorial misconduct do not warrant reversal unless a curative instruction would have been insufficient to alleviate the harm caused by the misconduct. *Id.*

"During a criminal trial, prosecutors serve truth and justice first. The job isn't just to win, but to win fairly, staying well within the rules." *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020) (quotation marks and citation omitted). "Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Claims of prosecutorial misconduct "are decided case by case, and this Court must examine the entire record and evaluate the prosecutor's remarks in context." *Id.* at 64. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial." *Id.* Indeed, a comment that could be construed as improper when viewed in isolation might not warrant appellate relief if it is responsive to arguments raised by defense counsel. *Id.* "The test for prosecutorial misconduct is whether the defendant was deprived of a fair trial." *People v Orlewicz*, 293 Mich App 96, 106; 809 NW2d 194 (2011).

## A. SHIFTING THE BURDEN OF PROOF

Defendant argues that two statement the prosecutor made during rebuttal arguments improperly shifted the burden of proof to the defense. We disagree.

It is improper for a prosecutor to comment on a defendant's failure to present evidence because doing so can have the effect of shifting the burden of proof to the defendant. *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). Defendant argues that the prosecution did just that when it made the following rebuttal argument:

> You heard criticism that not enough stuff was tested by the Michigan State Police. They should have sent more stuff to get tested.

> Well, hum, that's interesting, because first of all you heard Detective Dew testify this evidence is available for independent testing.

---

[7] Defense counsel did raise an objection at the outset of one of the allegedly inappropriate statements, but the grounds for the objection were never put on the record. Regardless, because we conclude that the comments in question were proper, it is ultimately immaterial if the issue is preserved or not.

You heard him testify there was no request for that type of testing in this case.

The prosecution opined that defendant did not actually want additional testing conducted because "[t]he more work that was done in this case would have given us more of the same, evidence of his culpability and that's it."

The defendant in *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003), raised the same burden-shifting argument after the prosecutor indicated that blood evidence was available to the defendant for independent testing. This Court rejected the defendant's argument, concluding that the prosecutor's comment was appropriate because the defendant had theorized at trial that there was a mistake in the custody or testing of that evidence. *Id*. at 331. The same reasoning applies here. The defense strategy was to focus on the possibility of reasonable doubt. To that end, defense counsel spent much of the trial questioning the details of the investigation and eliciting testimony from which the jury could infer that the investigation was deficient. In his cross-examination of Detective Dew, in particular, defense counsel explored why certain evidence had not been submitted for forensic testing. Defense counsel returned to this point during closing arguments, reminding the jury that the police chose to test only certain pieces of evidence that were subjectively deemed "important." Defense counsel opined that if evidence had any bearing on the credibility of the prosecution's case, it should be tested. He also suggested that the police should not be allowed to recognize the possible evidentiary value of a piece of property then unilaterally decide that the jury "will never see it." The prosecution's rebuttal argument regarding the availability of independent testing was clearly responsive to defense counsel's closing and is more properly viewed as an attack on defense counsel's argument than an impermissible attempt to shift the burden of proof by implying that defendant had an obligation to prove something. *Id*. Indeed, defense counsel went so far as to say that the police and prosecution decided "to rob" the jury of its opportunity to assess the importance of the evidence. The prosecution's remarks regarding the availability of independent testing directly refuted this argument raised by the defense and did not shift the burden of proof.

Defendant raises the same complaint concerning the prosecution's observation that there was no evidence that blood had been planted on defendant's shoe. This comment was appropriate for the same reason. Defense counsel criticized the failure to photograph the bottom of defendant's shoes and urged the jury to consider how the blood got on the shoes, and he even suggested that the blood may have been "placed on the shoe by somebody else," while recognizing that this suggestion appear "far fetch[ed]." Defense counsel bolstered this argument by asserting that the police officers involved with this case "have no problem lying to individuals."[8] Responding to this argument, the prosecution said: "Where is the evidence of that? There was nothing presented on that issue." Because the defense made serious accusations and insinuations regarding the investigation of this case, it would have been questionable for the prosecution not to somehow respond. Highlighting the fact that defendant's theory lacked evidentiary support was a logical

---

[8] This comment appears to have been in reference to testimony from Detectives regarding a strategy they used during the interrogation of defendant in which they lied about inculpatory evidence having been found in the hopes that this would manipulate him into confessing.

response to defendant's argument. Given the clear correlation between defense counsel's closing argument and this portion of the prosecution's rebuttal, we do not construe the challenged remark as an improper shifting of the burden of proof. See *Dobek*, 274 Mich App at 64 ("Otherwise improper prosecutorial conduct or remarks might not require reversal if they address issues raised by defense counsel."); *Callon*, 256 Mich App at 331 (concluding that an attack on the credibility of a defense theory does not shift the burden of proof).

## B. APPEAL TO SYMPATHY

Defendant argues that the prosecution made a statement during rebuttal that improperly appealed to the jury for sympathy. We disagree.

Defendant takes issue with the final portion of the prosecution's rebuttal argument, during which the prosecution said:

> [T]here is a voice that we hear in a way throughout this trial, again, it is not a voice that was able to get up on that witness stand, but it is the voice of [the victim], and he speaks to us in the only voice that he can speak with us.
>
> He speaks through his blood. The blood that was taken from his body at Collingwood and Second Street on May 25th of 2019. And what that blood is telling us, it's telling us that he did it.
>
> And I'm asking you to listen to that voice. And I am asking you to hold him accountable.

Defendant is correct that prosecutors may not "invite[] jurors to suspend their powers of judgment and decide the case on the basis of sympathy." *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014). However, the quoted argument did not violate this restriction because it is directly traceable to evidence admitted during the trial. A pair of shoes was seized from defendant's residence with what appeared to be a spot of blood on the left shoe. The stain was swabbed for possible DNA evidence and confirmed to be blood. An expert testified that the DNA extracted from the blood was approximately 33 nonillion times more likely to have originated from the victim than an unknown, unrelated person. Defendant admitted that the shoes belonged to him, and his contention that the blood must have appeared on the shoe when he was assaulted was undermined by expert testimony excluding the possibility that the DNA came from defendant. A prosecutor is not required to "confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. The prosecution's comment was founded on record evidence and reasonable inferences from the evidence, and it was not improper merely because the prosecution chose to artfully characterize the DNA evidence as the victim's metaphorical voice.[9]

---

[9] Relative to his prosecutorial misconduct arguments, defendant also contends that the cumulative effect of the prosecution's improper remarks was sufficiently prejudicial to warrant a new trial because the overall rebuttal suggested that defendant's defense was inadequate and that he was

In conclusion, defendant has failed to establish any form of prosecutorial misconduct.[10]

## IV. CONCLUSION

Defendant failed to establish that he is entitled to reversal based on a violation of his speedy-trial right. Defendant likewise failed to establish prosecutorial misconduct with respect to the comments made during rebuttal arguments. Therefore, defendant is not entitled to any appellate relief.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett
/s/ Allie Greenleaf Maldonado

---

responsible for providing exculpatory evidence. See *id*. at 106 ("The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal . . . ."). Because defendant has not established that any error in the challenged remarks, "there can be no cumulative effect of errors meriting reversal." *Dobek*, 274 Mich App at 58.

[10] We can easily dispense with defendant's argument that his trial counsel provided constitutionally ineffective assistance when he failed to object to these instances of prosecutorial misconduct. "To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (quotation marks, citation, and alteration omitted). Defense counsel did not err by failing to object to these arguments because, the arguments being proper, any objection would have been futile, and defense counsel is not ineffective for failing to raise a futile objection. *People v Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003).