*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DONALD SMITH,

Defendant-Appellant.

UNPUBLISHED
November 18, 2024
12:13 PM

No. 366973
Wayne Circuit Court
LC No. 19-004801-01-FC

Before: FEENEY, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Defendant appeals as of right his bench-trial convictions of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84; intentional discharge of a firearm at a dwelling, MCL 750.234b(3); possession of firearm by a person convicted of felony (felon-in-possession), MCL 750.224f; and three counts of carrying a firearm when committing or attempting to commit felony (felony-firearm), MCL 750.227b. We affirm.

## I. BACKGROUND

The victim was invited to defendant's home by defendant's daughter, AS. After he arrived, the victim and AS engaged in sexual intercourse in AS's bedroom. While the two were having sex, the victim heard footsteps coming up the stairs.

Accounts differ as to what happened next. The victim testified that he got up and hid in a closet, then heard someone come into AS's bedroom and ask AS who else was in the room with her. The victim came out of the closet with his hands up and saw defendant pointing a gun at him. The victim tried to ask defendant if he could gather his clothes off the ground, but defendant shot the victim in the neck. Only one shot was fired, according to the victim. The victim testified that, after the shooting, defendant told AS to help the victim out of the house. Once outside, the victim saw defendant get into his truck. Defendant then, according to the victim, chased the victim down the street, and the victim escaped by running into a tire shop. There, the victim asked for help. Police and paramedics arrived, and the victim was transported to a hospital to treat his gunshot wound.

-1-

In contrast to the victim's version of events, AS and defendant testified that the victim was standing in the middle of the room when defendant walked in. Defendant said that, when he entered the room, he saw the victim "reaching" then brandish a gun, at which point defendant rushed him. AS testified that she did not see a weapon on the victim until he went to "reach for" one when defendant came upstairs, at which point defendant rushed the victim. Defendant testified that he and the victim struggled for the gun, and after a shot was fired into the ceiling, defendant "twisted" the gun towards the victim, and "that's when it went off again and hit" the victim, who fell to the floor. AS testified that she did not watch the fight between defendant and the victim but heard "a couple shots go off." Defendant testified that, after the victim fell to the floor, defendant left and did not call the police. Defendant was not sure what happened to the gun, but he assumed the victim still had it in the room with AS. Defendant explained that he left because he was afraid of the victim shooting him. AS testified that after the victim was shot, she told him to leave, and he did. AS was unsure what happened to the gun. AS also confirmed that she did not call the police or paramedics after the shooting.

When police interviewed the victim at the hospital, the victim gave the police a description of defendant. While still at the hospital, the victim was given a photographic lineup and identified defendant as the person who shot him. Officers obtained a search warrant for defendant's home, and during the ensuing search, they recovered a single spent shell casing from AS's bedroom. Officers also observed what appeared to be a bullet hole in the ceiling and another apparent bullet hole near "a window or some blinds." Defendant was eventually arrested and charged.

Trial was initially scheduled for October 19, 2019. The trial court unilaterally adjourned the trial to February 3, 2020. On January 27, 2020, the trial was rescheduled to April 29, 2020, at defense counsel's request. The April 29, 2020 trial date was cancelled because of the COVID-19 pandemic.

The trial court held a pretrial hearing on September 2, 2020, during which the prosecuting attorney explained that the original prosecuting attorney assigned to this case was "out on maternity" leave, and the case had "been reassigned to [the current prosecuting attorney] just within the last few days." The court nevertheless asked the parties to "go through the check list" with the court to ensure that the case was ready for trial, as trial had originally been scheduled for April 2020. When the trial court asked the parties whether they had discussed preliminary jury instructions, defense counsel indicated that they had not, and the trial court said it would order the parties "to confer" with one another and come up with preliminary jury instructions for the court. When the court asked the parties how long they would need to do this, defense counsel deferred to the prosecuting attorney because he had only recently gotten the case, and the prosecutor stated that he could have the instructions submitted "in the next week." In response, the trial court said that it could give the prosecutor more time if he needed it, and the prosecutor stated, "I'll take as much time as you're prepared to give, just so I can, you know, get myself up to speed on this." The trial court accordingly granted the parties two weeks to come up with jury instructions, stating that they were due by September 16. The court explained that, after it received the submitted jury instructions, the case would be placed "on the jury trial docket" and the parties would eventually "be notified as to before whom the matter will be heard, and on what date."

On January 13, 2023, the parties appeared before the trial court to set a date for trial. The parties agreed to a May 24, 2023 trial, and a bench trial commenced on that date. Following the bench trial, the trial court convicted defendant of the crimes listed above. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support his convictions. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews de novo a challenge to the sufficiency of the evidence in a bench trial." *People v Lanzo Const Co*, 272 Mich App 470, 473-474; 726 NW2d 746 (2006).

## B. ANALYSIS

A challenge to the sufficiency of the evidence requires this Court to ask "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). For this inquiry, all of the evidence is viewed in the light most favorable to the prosecution, meaning that any conflict in the evidence is resolved in the prosecution's favor. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012); *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). "The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). " 'Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.' " *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich at 428. "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

Defendant does not challenge his convictions by suggesting that the prosecution failed to present sufficient evidence to establish the elements of the crimes charged. Instead, defendant argues that the victim's testimony about the shooting was impeached by physical evidence, so "the trial court could not reasonably conclude that [defendant] shot" the victim. In support of this argument, defendant focuses on the two bullet holes found in AS's bedroom—he contends that this evidence impeached the victim's testimony that only one shot was fired, and that the placement of the bullet holes impeached the victim's testimony about the circumstances of the shooting.

We reject this argument for a number of reasons. First and foremost, regardless of whether the victim accurately recounted the number of shots fired or where he was standing relative to defendant when defendant shot him, the victim still testified that defendant intentionally shot him. The trial court could credit the victim's testimony that defendant intentionally shot him even if the court did not credit the victim's testimony about where he was standing relative to defendant when he was shot or how many shots were fired. That is, even if defendant is right about how the

physical evidence impeached the victim's testimony, the trial court could still credit the victim's testimony that defendant intentionally shot him. And on the basis of that testimony, the trial court could reasonably conclude that defendant intentionally shot the victim, contrary to defendant's argument.

Second, and equally important, the placement of the bullet holes did not impeach the victim's testimony about the circumstances of the shooting. The victim testified that, when he stepped out of the closet into AS's bedroom, he saw defendant standing in the doorway with a gun, and defendant shot him shortly afterwards. Given the layout of AS's bedroom as can be seen in body-camera video of the search of defendant's home, a bullet shot from the doorway of AS's bedroom toward someone standing in AS's room would likely hit the window across from the doorway, which is where officers found one of the bullet holes.[1]

The only other inconsistency between the victim's testimony and the physical evidence identified by defendant concerns the victim's testimony about the number of shots fired (he said there was only one) and the number of bullet holes found in AS's bedroom (officers found two). The trial court explicitly acknowledged this inconsistency and concluded that the victim's testimony was still credible. The trial court chalked up the inconsistency to the fact that the victim was shot; the court rhetorically asked, "Do you expect him to have all his senses?" This Court generally defers to the factfinder's ability to judge the credibility of witnesses that appear before it, *Kanaan*, 278 Mich App at 619, and there is no reason to deviate from this general rule here.

Defendant suggests that this Court should not defer to the trial court's credibility determinations in this case because the trial court "ignored" the fact that defendant and AS "told an identical story" and "were not impeached" whereas the victim was impeached. Credibility determinations, however, depend on more than how many witnesses confirm a story or how many times a witness is impeached,[2] and the trial court provided rational bases for concluding that neither defendant's nor AS's testimony was credible. Defendant testified that he came home to find an unknown man in his daughter's bedroom, the unknown man tried to pull a gun on defendant so defendant rushed him, a struggle ensued in which the unknown man was shot, then defendant fled his own home, leaving his daughter alone with a potentially-armed, unknown man. The trial court reasonably discredited this account of events because it was "bizarre" and "ridiculous." For AS, the court believed that defendant "forced his daughter to come here and tell this story,"

---

[1] Defendant's argument suggests that he incorrectly believes that the victim testified that defendant shot the victim while the victim was still in, or nearly in, the closet. Defendant emphasizes that no bullet holes "were embedded in the closet," but that is not where one would expect to find a bullet shot from the doorway of AS's bedroom toward someone standing in the bedroom. Defendant also contends that he "could not have fired a bullet . . . across the room if he had pointed the gun straight at" the victim, but that seems to be exactly where defendant would have fired the bullet if, as the victim testified, defendant shot the victim from the doorway of AS's bedroom after the victim came out of AS's closet.

[2] "The credibility of a witness is determined by more than words and includes tonal quality, volume, speech patterns, and demeanor, all giving clues to the factfinder regarding whether a witness is telling the truth." *People v Lemmon*, 456 Mich 625, 646; 576 NW2d 129 (1998).

demonstrating the court's belief that AS was lying to protect her father. The trial court had the benefit of sitting through trial and observing each witness as they testified, and it provided sensible reasons for concluding that the victim's testimony was worthy of belief while AS's and defendant's testimonies were not.

Overall, defendant challenges not the quantity of the prosecution's evidence but its quality—defendant argues that the victim's testimony supporting defendant's convictions was unbelievable, while defendant's and AS's testimonies contradicting the victim's version of events were credible. None of defendant's arguments for disregarding the trial court's credibility determinations are persuasive, however. We consequently reject defendant's challenge to the sufficiency of the evidence because, on the basis of the evidence presented at defendant's trial, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.

### III. SPEEDY TRIAL

Defendant next argues that the significant delay between when he was arrested and when his trial commenced violated his right to a speedy trial. We disagree.

### A. STANDARD OF REVIEW

Generally, whether a defendant's right to a speedy trial has been violated is reviewed de novo, *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006), but because defendant failed to preserve his speedy-trial challenge by raising it in the trial court, see *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999), the issue is reviewed for plain error affecting substantial rights, *People v Carines*, 460 Mich 750, 762-763; 597 NW2d 130 (1999). To be entitled to relief under the plain-error standard, the defendant must establish that (1) an error occurred, (2) the error was clear or obvious, and (3) the obvious error affected the defendant's substantial rights. *Id*.

### B. ANALYSIS

Both the Michigan and United States Constitutions guarantee criminal defendants the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. A defendant's right to a speed trial is not violated if his or her case does not proceed to trial after a fixed number of days. *Id*. "Rather, when evaluating a speedy-trial claim, the reviewing court is required to balance four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3 (quotation marks and citation omitted).

### 1. LENGTH OF DELAY

The length of the delay in this case was about 48 months—defendant was arrested on June 2, 2019, and his trial commenced on May 24, 2023. A delay over 18 months is presumed prejudicial, *Williams*, 475 Mich at 262 , so the nearly 48-month delay in this case is presumptively prejudicial, and we must address the remaining factors to determine whether defendant was deprived of his right to a speedy trial.

## 2.  REASON FOR DELAY

Turning to the reason for the delay, reviewing courts consider which portions of the delay are attributable to each party, and "may attribute unexplained delays—or inexcusable delays caused by the court—to the prosecution. " *People v Lown*, 488 Mich 242, 261-262; 794 NW2d 9 (2011).  Delays inherent in the court system, while technically attributable to the prosecution, are assigned only minimal weight when determining whether a defendant's right to a speedy trial was violated.  *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158 (1997).

Defendant was arrested on June 2, 2019, and was originally scheduled for trial on October 19, 2019.  This four-month delay appears due to typical docket congestion, and it is therefore attributed to the prosecution, although it is assigned only minimal weight.  The trial court then unilaterally delayed defendant's trial from October 19, 2019 to February 3, 2020.  While this roughly four-month delay was caused by the trial court, it is also technically attributable to the prosecution, although, again, it is given only minimal weight.  On January 27, 2020, defense counsel requested an adjournment due to a scheduling conflict, and the case was rescheduled to April 29, 2020.  This roughly three-month delay is attributable to defendant.  The April 29, 2020 trial date was cancelled because of the COVID-19 pandemic.  The next hearing took place on September 2, 2020, at which time the trial court ordered the parties to submit jury instructions by September 16, 2020.  The court explained that, after it received the submitted jury instructions, the case would be placed "on the jury trial docket," and the parties would "be notified as to before whom the matter will be heard, and on what date."  The parties did not appear before the trial court again until January 13, 2023, at which time they agreed to a May 24, 2023 trial date.  In *Smith*, ___ Mich App at ___; slip op at 5, this Court held "that delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy trial claim."  While there is no record of why the parties did not meet to schedule defendant's trial until January 13, 2023, the delay was clearly "caused by the COVID-19 pandemic, whether because of mandated courtroom closures or the resulting backlog of cases that prevented [defendant's] case from quickly proceeding to trial."  *Id*. at ___; slip op at 5.  Because the delay from April 29, 2020 to January 13, 2023 was caused by the COVID-19 pandemic, it is not attributable to either party.  The remaining four-month delay from January 13, 2023 to May 24, 2023 was seemingly due to typical docket congestion, which is attributable to the prosecution but given minimal weight.

Defendant argues that the COVID-19 pandemic accounted for only 12 months of the delay from April 29, 2020 to May 24, 2023 because, according to defendant, the trial court "resumed jury trials in July 2021."  In support of this assertion, defendant relies on an undated press release stating that "July 19, 2021 is the target date for jury trials to resume" in Wayne County.  This press release establishes nothing, however—that Wayne County was *hoping* to resume jury trials in July 2021 is not evidence that Wayne County did so.  Regardless, it cannot be seriously disputed that, in July 2021 and afterwards, the trial court was experiencing explainable and excusable pandemic-related delays, including working through the backlog of cases caused by the COVID-19 pandemic.

Defendant additionally relies on a statement made by the prosecutor at the September 2, 2020 hearing to argue that "the prosecutor asked for as much time as possible to get up to speed on [defendant's] case" and "[t]he trial court obliged, and it didn't schedule a trial date until May 2023."  While it is true that at the September 2, 2020 hearing, the prosecutor told the trial court

that he would "take as much time as [the court was] prepared to give," this statement was in response to the trial court's request that the parties submit proposed jury instructions. The prosecutor said he would take as much time as the court was prepared to give to confer with defense counsel and prepare the proposed instructions. In response, the court granted the parties two weeks to file their proposed instructions. The court then told the parties that, after it received their instructions, the case would be placed "on the jury trial docket," and the parties would "be notified as to before whom the matter will be heard, and on what date." Defendant's suggestion that the prosecutor asked to delay defendant's trial as long as possible and "[t]he trial court obliged" by not scheduling the trial until May 2023 is wholly disproven by the record.

For these reasons, we conclude that, of the 48-month delay in this case, 12 months are attributable to the prosecution, 3 months are attributable to defendant, and the remainder is attributable to neither party, having been caused by the COVID-19 pandemic. Additionally, the 12 months of delay attributable to the prosecution were delays inherent in the court system, so they are given only minimal weight. See *Gilmore*, 222 Mich App at 460.

### 3. ASSERTION OF RIGHT

The next factor looks to whether defendant asserted his right to a speedy trial. " '[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.' " *Smith*, ___ Mich App at ___; slip op at 6, quoting *Barker v Wingo*, 407 US 514, 532; 92 S Ct 2181; 33 L Ed 2d 101 (1972). Here, defendant never asserted his right to a speedy trial in the nearly four years that this case was pending before trial court, which weighs heavily against his speedy-trial claim.[3]

### 4. PREJUDICE

The last factor we must consider is the prejudice to defendant. The delay in this case was longer than 18 months and is therefore presumptively prejudicial. See *Williams*, 475 Mich at 262. But like presumptions in general, this one can be rebutted. *Id*. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). Prejudice to the person generally refers to "oppressive pretrial incarceration leading to anxiety or concern." *Id*. Prejudice to the defense refers to a defendant's ability to defend against the prosecution's charges and is therefore "the more serious concern." *Williams*, 475 Mich at 264. This type of prejudice can include "key

---

[3] For this issue, defendant makes two cursory arguments without citation to authority, thereby abandoning the arguments. See *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001) ("Defendant's failure to cite any supporting legal authority constitutes an abandonment of this issue."). Even if not abandoned, though, defendant's arguments are unpersuasive. Defendant contends that he did not have the opportunity to assert his right to a speedy trial because the court never scheduled a hearing, but defendant did not need a hearing to assert this right—he could have asserted the right by filing a motion with the trial court. Defendant also highlights the fact that he was diagnosed with cancer while awaiting trial, but defendant does not explain why this health issue precluded him from asserting his right to a speedy trial (assuming that defendant even desired to proceed with a speedy trial while battling a serious health concern).

witnesses being unavailable," *Collins*, 388 Mich at 694, or "[l]oss of memory caused by the passage of time," *Smith*, ___ Mich App at ___; slip op at 6.

The prosecution contends that it can rebut the presumption of prejudice in this case because there is nothing in the record to suggest that defendant's person or defense was prejudiced. With respect to prejudice to defendant's defense, the prosecution concedes that certain witnesses were unable to recall some details but contends that the details the witnesses were unable to recall were either irrelevant or filled in by other evidence. Having reviewed the record, we agree.

There is no suggestion—and defendant does not contend—that the delay in bringing this case to trial resulted in defendant being unable to present any part of his defense, such as a key piece of evidence or a key witness. And while it is true—and as the prosecution concedes—that some witnesses forgot certain details, the details that witnesses forgot did not prejudice defendant's defense because the pertinent facts were either irrelevant or established by other evidence.

Defendant disagrees, first highlighting the fact that the victim could not remember "when the shooting took place, the bedroom's layout, and the description of the suspect that he gave to police." But the date of the shooting and the layout of AS's bedroom were established by other evidence, so the fact that the victim could not remember these details did not prejudice the defense. As for the victim's inability to remember the description of the suspect he gave to police, defendant's defense was not prejudiced because there was no dispute that the victim was shot during an altercation with defendant. Defendant also highlights that officers "were unable to tell the court about how [defendant] was arrested" and "had trouble pinpointing exactly where the bullet casing was found in [AS's] bedroom." Defendant, however, does not explain—and it is not otherwise apparent—why details about how defendant was arrested were relevant to the charges facing defendant. As for the location of the shell casing found in AS's bedroom, a photograph showing the location of the casing in AS's bedroom was admitted as an exhibit at trial.

As for prejudice to defendant's person, the prosecution argues that it rebutted any presumption of prejudice because defendant was out on bond while awaiting trial, so the type of prejudice with which this factor is concerned is not even implicated. We agree that, because defendant was out on bond, he did not suffer the type of "oppressive pretrial incarceration leading to anxiety or concern" with which prejudice to the person is generally concerned. *Collins*, 388 Mich at 694. Defendant contends that he suffered prejudice to his person because he was diagnosed with cancer while awaiting trial, but he cites no authority to support that this constitutes prejudice to his person for purposes of determining whether his right to a speedy trial was violated, thus abandoning the argument. See *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001) ("Defendant's failure to cite any supporting legal authority constitutes an abandonment of this issue.").[4]

---

[4] Even if not abandoned, defendant fails to explain how his cancer diagnosis was related to the delay in bringing his case to trial. Defendant does not contend that the delay caused him to be diagnosed with cancer (which would be shocking), nor does defendant contend that the delay in bringing his case to trial somehow made his cancer diagnosis worse. While we are sympathetic to

## 5. SPEEDY-TRIAL CONCLUSION

While the delay in this case was substantial, only 12 months of the delay are attributable to the prosecution, and all of that delay weighs only minimally in defendant's favor. Still, the lengthy delay was presumptively prejudicial, but the prosecution has sufficiently demonstrated that defendant was not, in fact, prejudiced by the lengthy delay in any way. Indeed, defendant was out on bond while awaiting trial. Finally, in light of the length of the delay and the fact that the delay did not prejudice defendant, defendant's decision to not assert his right to a speedy trial at any point during the lengthy delay weighs heavily against finding a speedy-trial violation. Taking these relevant factors together, they clearly do not support a conclusion that defendant's right to a speedy trial was violated, let alone that it was plainly violated. We accordingly conclude that defendant has not establish that his right to a speedy trial was plainly violated.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace

---

defendant's plight, it is simply not apparent how defendant's cancer diagnosis is relevant to determining whether defendant's right to a speedy trial was violated.