*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

V

CHRISTOPHER ANDREW SHAFT,

Defendant-Appellant.

UNPUBLISHED
May 18, 2026
11:51 AM

No. 373642
Tuscola Circuit Court
LC No. 2024-016466-FH

Before: ACKERMAN, P.J., and BORRELLO and LETICA, J.

LETICA, J. (*dissenting*).

I respectfully dissent. In my view, the evidence was sufficient for a rational jury to find defendant guilty beyond a reasonable doubt of the crime of carrying a concealed weapon in a motor vehicle. MCL 750.227(1). Accordingly, I would affirm defendant's conviction.

## I. FACTS

### A. THE TRIAL TESTIMONY

The police came upon defendant, who was homeless, in his small Chevy S-10 pickup truck, parked in the fairgrounds at about 11:20 p.m. on Wednesday, April 10, 2024. Because the fairgrounds were closed, Caro City Police Department Officer David Peters approached the truck's driver's side as Officer Samuel Gaiser approached the passenger side. Peters requested defendant's identification. Defendant was playing with and charging his Nintendo Switch, which he tossed onto the center console, before providing his identification. At that point, Gaiser saw a knife on the console. Over the top of the truck, Gaiser alerted Peters to the fact that there was a knife within defendant's reach. The knife was about 8 inches long with a fixed-blade and a cutting edge of about 3½ inches. The sheath for that knife was either on the front driver or passenger seat.

For officer safety, Peters asked defendant to get out of his vehicle, which he did. Peters told defendant that he was going to pat him down. Defendant then informed Peters that "he had a pocketknife on him." That folding Gerber knife had a mechanism to lock the blade, which

-1-

appeared to be sharp, in place. This second knife was about 8 inches long with a blade of about 3½ inches.[1]

Asked whether he had anything else in the truck, defendant reported "a camp knife," referring to the knife Gaiser had seen on the console. Peters then took the knife he had removed from defendant's pocket and escorted defendant to the front of the patrol vehicle to separate him from his truck. Peters asked if the police could search defendant's truck, and defendant consented.

Gaiser then searched defendant's truck. He found an additional knife, identified as a butterfly knife, which was about 9 inches long with the blade length of the cutting edge being approximately 4 inches, in defendant's center console along with other items. It was immediately apparent to Gaiser that this knife "could . . . pose as a dangerous weapon[.]"[2]

Gaiser brought the butterfly knife to defendant's attention. Defendant said he had forgotten about it and he used the butterfly knife "for party tricks with his friends." Gaiser, who was "looking for anything that was dangerous to" an officer, found no other weapons in defendant's truck. Peters arrested defendant for carrying a concealed weapon (CCW).

At trial, Gaiser testified defendant had "multiple dangerous stabbing weapons within . . . arm's reach[.]" All three knives "would have been easily accessible to [defendant] if he wanted to use them in offense or defense[.]"

Gaiser also observed there were other locations where defendant could have stored weapons in his truck, including a steel toolbox attached to the back of his truck and other boxes and bags in the truck bed. Peters did not recall the toolbox, but he confirmed that there were other places in the truck where defendant could have stored the knives that would not have caused a concealed weapon issue, i.e., they would have been outside defendant's reach. Absent the discovery of the knives within defendant's reach, the police would have simply directed defendant to leave the fairgrounds.

During trial, the knives themselves were admitted as exhibits. Additionally, a single photograph of each knife positioned against a measuring tape was admitted allowing the jury to see its length and blade.

## B. DEFENDANT'S MOTION FOR A DIRECTED VERDICT

After the prosecution rested, defendant moved for a directed verdict. Defense counsel provided the trial court with copies of *People v Brown*, 406 Mich 215, 222; 277 NW2d 155 (1979), *People v Vaines*, 310 Mich 500; 17 NW2d 729 (1945), and *People v Tetreau*, unpublished per

---

[1] At trial, Peters also opined that the folding knife he had retrieved from defendant's pocket could be used to cause serious injury or great bodily harm to another person.

[2] At trial, Peters testified that the butterfly knife opened easily and could be used to inflict great bodily harm on someone. Gaiser later explained to the jury how a butterfly knife operated. It had a hinge on the bottom and the handle folded around the top of the blade to allow a person to grab one side or the other and snap it open.

curiam opinion of the Court of Appeals, issued August 1, 1997 (Docket No. 189024).[3] Defense counsel contended that there was no showing that defendant's knives were "used for or intended for use as a weapon for bodily assault or defense." Specifically, a closed pocketknife was not a dangerous weapon per se, and, for it to be considered a dangerous weapon, there had to be a showing that it "was used for the purpose of being a dangerous weapon, or for the purpose of some type of bodily assault or defense." Further, defendant noted that *Tetreau* involved a butterfly knife. The *Tetreau* panel held that there was insufficient evidence to support the defendant's conviction when the defendant testified that the butterfly knife was a gift from his wife and there was nothing presented during trial reflecting his intention to use that knife for assault or defense.[4]

Addressing the fixed-blade knife, also referred to as a camp or hunting knife, the prosecutor responded that it was on the truck's center console and was unsheathed. Defendant did not mention it until after the police saw it. And, although not disclosed to the jury, the prosecutor noted that defendant was on probation and prohibited from having any weapons; in fact, defendant admitted he would not have been permitted to have the knives. Furthermore, the "officers knew that . . . defendant was involved in a – in an incident that involved a stabbing shortly before this incident."[5] Addressing the folding knife in defendant's pocket, the prosecutor asserted it was not "grandpa's pocketknife," but "sharpened onto a blade knife[.]" The prosecutor explained "[s]uch knives are generally designed so that they have more – more heft behind the blade. It's not a gentle taper so they don't break off when they're used to stab." Again, that knife was not disclosed until the officer said he was going to pat down defendant. Finally, addressing the butterfly knife, the prosecutor asserted that it was "a dangerous stabbing weapon, . . . apparent by just looking at the thing." In fact, it had "the same blade shape as the knife" found on defendant:

> [T]he tanto[6] style blade to kind of one -- depending on how you classify it, one or two sharpened -- sharpened edges there. You got the tip -- the sharpened tip. And then you've got the main length of the blade there. It is designed to be easily clicked open and -- so that it could be deployed quickly. It is kept right next to the defendant essentially where the defendant's hip would be there in the center console of the vehicle. And his claim that he didn't remember it was there is not dispositive of -- of whether the -- the jury can infer that he knew of its presence because he -- he was not surprised and he knew what the weapon was upon it being brought to his attention and -- and had some claims about it.

---

[3] "An unpublished opinion is not precedentially binding under the rule of stare decisis." MCR 7.215(C)(1). Nevertheless, unpublished opinions "may be persuasive." *People v Daniels*, 311 Mich App 257, 268 n 4; 874 NW2d 732 (2015).

[4] Defendant also claimed that as a homeless person, he could lawfully possess all three knives because his truck was his "dwelling place." Defendant has not pursued this contention on appeal.

[5] The prosecutor stated that this was not being presented to the jury because it was "highly prejudicial."

[6] A "tanto" is a type of medieval Japanese sword blade. See William E. Deal, Handbook to Life in Medieval and Early Modern Japan, pp 160-161 (2007).

Thus, the prosecution contended that there was sufficient evidence to submit the matter to the jury.

In response, defense counsel contended that in *Brown*, our Supreme Court ruled that the fact that a machete, a pointed instrument, had great potential to be a dangerous weapon did not make it a dangerous weapon per se. Moreover, no evidence of defendant's intent had been presented, entitling defendant to a directed verdict.

The prosecutor responded that *Brown* was distinguishable. And the prosecutor asked the trial court "to find that this is of the same class as all other weapons within that statute."

The trial court denied defendant's motion for a directed verdict. Specifically, it ruled:

There's three knives at issue. So, I'm going to refer to the exhibit numbers. People's exhibit one, which is a photograph of what's been referred to as a camp knife [the fixed-blade knife]. That was on the center console. In taking a look at that photograph, it certainly is, without issue, a knife. And it has kind of an interesting handle. Not really the normal handle that you would have on like a kitchen knife because it has grooves for your fingers. But in any event, it's a knife, found on the center console, not disclosed to the officer immediately. Easily accessible located within an S[-]10, not in sheath or otherwise covered.

And then exhibit People's exhibit two is a knife that was described as a folding, locking knife. It has a very distinct point on it with a smaller cutting surface at the top. That was concealed on the defendant's person, not disclosed prior to the pat down commencing.

And then People's three is a photograph of what's commonly known as a butterfly knife. Same blade shape as exhibit two. Located in the cen – center console in the vehicle. When questioned regarding this knife, the defendant indicated to the officer that he didn't remember it was there.

So, it's -- the question is whether or not it's reasonable for the jury to come to the conclusion that these three weapons constituted dangerous weapons for the purposes of finding the defendant guilty for [sic] carrying a concealed weapon. Now, one weapon was found on his person. Two weapons found in the vehicle. The question is whether or not it was a dangerous stabbing weapon.

CJI[,] I believe it's 11.09 -- nope not 9[, 11.]04 – I believe defines dangerous stabbing weapon, a dangerous stabbing weapon is any object that is carried as a weapon for bodily assault or defense and that is likely to cause serious physical injury or death when used as a stabbing weapon. You must decide from all the facts and circumstances whether the evidence shows that the knife in question here was a dangerous stabbing weapon.

The nature of these three weapons that it would be completely reasonable for the jury to conclude that those constituted stabbing weapons. One again being concealed on the defendant's person. Two being concealed in the vehicle. It's not whether or not you could argue the other way. It's whether or not in a light most

favorable to the prosecution would it be reasonable for them to conclude that the defendant by a reasonable doubt is guilty of carrying a concealed weapon. And specifically, that these three weapons constituted dangerous stabbing weapons by virtue of the nature of which they were being carried, as well as the nature of the weapons.

And so, the Court finds that it would be completely reasonable for the jury to do so. And the motion is considered and denied.

### C. DEFENDANT'S TESTIMONY

Defendant opted to testify. On April 10, 2024, defendant was living in his "very small single cab Chevy S[-]10." At the time of defendant's trial in July 2024, defendant had been homeless for about four years.

Defendant was at the fairgrounds charging his mobile device. He arrived before closing time and did not see the signs addressing the hours of operation.

While charging and playing his Nintendo Switch, defendant made peanut butter sandwiches for himself. He retrieved the "camp knife" (the fixed-blade knife) out of his "tackle box to use as a peanut butter knife." Defendant testified that the peanut butter was still visible on that knife.[7] Defendant also testified that the camp knife was "highly versatile[,]" including for processing fatwood,[8] harvesting Chaga,[9] and processing fish and turtles, which was permitted "year[-]round."

Within minutes of defendant consuming his last sandwich, the police arrived. Defendant's interactions with the officers were polite and compliant. When advised that Peters was going to pat him down, defendant told him about the folding knife in his front right pocket, which was "[a] regular pocketknife." Defendant used that knife "for cutting, mostly making feather sticks to make fires, * * * [p]rocessing wood, [and a] lot of stuff."

Defendant later consented to the police searching his truck. When the police showed him the butterfly knife, he immediately remembered it was in his truck. Defendant used the butterfly knife "for tricks."

Because the police never asked defendant how he used the fixed-blade knife, he did not tell them he was using it to make sandwiches. Initially, defendant denied telling the police he was sharpening the camp knife. Instead, he said that he intended to clean it and return it to its sheath before placing it in his tackle box. Thereafter, defendant testified that he told Peters that he

---

[7] Gaiser confirmed that there was an open jar of peanut butter in the truck. Moreover, he was "sure there was" bread in the truck because "[t]here was [sic] a lot of food items inside" it.

[8] Fatwood is "wood used for kindling; *esp* **:** coniferous wood abounding in pitch." Merriam-Webster's Collegiate Dictionary (12th ed), pp 594, 921.

[9] Chaga is a fungus that grows on trees. Merrian-Webster's Collegiate Dictionary (12th ed), p 275.

intended to sharpen the fixed-blade knife. Defendant agreed that the fixed-blade knife "could be used as [a] dangerous stabbing weapon[.]" Defendant further agreed that it could be used to cut "into human flesh if used in an offensive or defensive manner[.]" Defendant did not tell the police about the fixed-blade knife until Gaiser said he saw it. Defendant testified the fixed-blade knife was in his passenger seat and that his arm was on his center console.

Addressing the folding knife in defendant's pocket, defendant admitted it was sharp and could be used to cut flesh. It could also "be used as a dangerous stabbing weapon if . . . so employed[.]"

As to the butterfly knife, the following exchange occurred between the prosecutor and defendant:

> *Q.* This is also . . . could be used as a dangerous stabbing weapon?

> *A.* If somebody was brave enough to use it as that. They're not revival [sic] as such.

> *Q.* Okay. So, you have . . . some knowledge of -- of what would make a reliable knife in a self[-]defense or an offensive situation?

> *A.* No. I just know that they're very faulty.

> *Q.* Okay. Could be used by somebody who -- who wished to use it in that manner?

> *A.* Correct.

Defendant further testified he had "completely forgotten about" the butterfly knife in his center console. He had placed it there "[w]hen he was moving out" and "would have to imagine it was buried at the bottom of the center console." Defendant also testified: "I don't even use it."

## D. THE REBUTTAL TESTIMONY

Peters was recalled. He testified that after he removed defendant from the truck, defendant reported that he was sharpening the fixed-blade knife. Defendant did not mention making peanut butter and jelly sandwiches, and Peters did not see any sandwich residue on the fixed-blade knife.

## E. THE PARTIES' CLOSING ARGUMENTS

The prosecutor argued that the knife in defendant's pocket was "a Tonto style blade so there's more metal behind the tip rather than the gradual taper that are in other knives." It was a dangerous stabbing weapon, and defendant recognized the damage it could do. The prosecutor explained that it was not a small knife that one might use to open Amazon packages or cut a string off one's clothing. Instead, it was "a substantial knife."

The prosecutor also contended that the fixed-blade knife was a dangerous stabbing weapon given its appearance. And the butterfly knife was a dangerous stabbing weapon given defendant's admission that it could do bodily harm to someone. It was sharp and "[c]ould be used as a stabbing weapon."

In defendant's closing argument, counsel responded that any knife could be used as a dangerous weapon. If so, anyone who had a pocketknife or utility knife would be sitting at the defense table. Defendant did not use any of the knives as a stabbing instrument to inflict bodily injury or use it for the purpose of defense. Because there was no evidence of defendant's intent, he was not guilty of carrying a dangerous weapon.

In rebuttal, the prosecutor contended the issue was not whether one could use a pen as a dangerous weapon. Instead, defendant had three sharpened knives within his reach in a public place after dark. The fixed blade knife was unsheathed. Defendant did not disclose he was making peanut butter sandwiches; instead, he told Peters that he was sharpening the fixed blade knife. Moreover, although "these knives can be used for peaceful purposes . . . they are inherently dangerous in this case." They were sharp and could be used to cause great bodily harm to people. The prosecutor asserted: "[I]f an object's carried for use as a stabbing weapon and . . . is likely to cause serious physical injury or death when it is used as a stabbing weapon, it's a dangerous stabbing weapon." There was a reason that defendant did not disclose the knives to the police, and the jury did not have to accept defendant's testimony that he was using them for innocent purposes. Finally, the prosecutor observed that the jurors had "enough wisdom and experience in [their] lives to know what the knives were intended for." The prosecutor asked the jurors to "look at the evidence, look at what's presented, look at the circumstances here," and return a guilty verdict because the prosecution had met its burden of proof.

## F. THE COURT'S INSTRUCTIONS

The court instructed the jury:

To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

* * *

If the defendant carried a weapon in a vehicle:

First, that the instrument or item was a dangerous stabbing weapon.

Second, that the instrument or item was in a vehicle that the defendant was in.

Third, that the defendant knew the instrument or item was in the vehicle.

Fourth, that the defendant took part in carrying or keeping the instrument or item in the vehicle.

A dangerous stabbing weapon is any object that is carried as a weapon for bodily assault or defense and that is likely to cause serious physical injury or death when used as a stabbing weapon.

Some objects, such as guns or bombs, are dangerous because they are specifically designed to be dangerous. Other objects are designed for peaceful purposes but may be used as dangerous weapons. The way an object is carried determines whether or not it is a dangerous weapon. If an object is carried for use as a stabbing weapon, and is likely to cause serious physical injury or death when used as a stabbing weapon, it is a dangerous stabbing weapon.

You must decide from all of the facts and circumstances whether the evidence shows that the knives in question here were a [sic] dangerous stabbing weapons.

An essential element of the crime of carrying a concealed weapon is that the defendant must have knowingly carried the weapon.

If you are not convinced beyond a reasonable -- reasonable doubt that the defendant knew that the weapon in the automobile, then you must find the defendant not guilty.

A hunting knife is a large, heavy, wide-bladed knife with a single cutting edge that curves up to a point. It is typically used to skin and cut up game.

This law does not apply to hunting knives adapted and carried as hunting knives. The prosecutor has the burden of proving beyond a reasonable doubt that the knife involved was not a hunting knife.

## G. THE JURY'S VERDICT

While deliberating, the jury asked to see the fixed-blade knife. And, later, it asked for clarification about which knife was assigned to which charge. After 44 minutes, the jury announced that it had a verdict. Although the jury acquitted defendant of CCW and CCW in a motor vehicle on the counts involving the folding knife in defendant's pocket and the fixed-blade knife, it convicted defendant of CCW in a motor vehicle on the count related to the butterfly knife.

Defendant now appeals.

## II. ANALYSIS

## A. STANDARD OF REVIEW

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury

verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses." *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020). "Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime." *Id*. "The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *Id*. "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. (quotation marks and citation omitted.)

"Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent." *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014). "[Q]uestions of intent and honesty of belief inherently involve weighing the evidence and assessing the credibility of witnesses, which is a task for the jury." *People v Cain*, 238 Mich App 96, 119; 605 NW2d 28 (1999).

## B. THE CCW STATUTE

MCL 750.227(1) prohibits carrying a concealed weapon in a motor vehicle. It provides:

> A person shall not carry a dagger, dirk, stiletto, a double-edged nonfolding stabbing instrument of any length, or any other dangerous weapon, except a hunting knife adapted and carried as such, concealed on or about his or her person, or whether concealed or otherwise in any vehicle operated or occupied by the person, except in his or her dwelling house, place of business or on other land possessed by the person. [*Id*.]

The purpose of the CCW statute is "[t]o prevent the possibility that quarrelling persons would suddenly draw a hidden weapon without notice to other persons." *People v Nimeth*, 236 Mich App 616, 621; 601 NW2d 393 (1999).

Applying the statutory construction principle of ejusdem generis, our Supreme Court ruled a prior version of MCL 750.227(1)[10] applied to the weapons enumerated and to similar stabbing weapons. *People v Smith*, 393 Mich 432, 436-437; 225 NW2d 165 (1975). Thus, the elements of CCW in a motor vehicle are: (1) that the item was one of the enumerated items or a dangerous

---

[10] *Smith* was convicted under the version of MCL 750.227(1) in effect in 1970, which read: "A person shall not carry a dagger, dirk, stiletto, or other dangerous weapon except hunting knives adapted and carried as such. . . ." The statute was amended by 1973 PA 206, § 1, and, again, by 1986 PA 8, § 1, including to add the word "any" before the phrase "other dangerous weapon." After the 1986 statutory amendment, this Court continued to conclude that MCL 750.227(1) "applies only to stabbing type weapons[.]" *People v Johnson*, 175 Mich App 56, 57; 437 NW2d 302 (1989).

-9-

stabbing weapon, (2) that the item was in a vehicle that the defendant was in, (3) that defendant knew the item was in the vehicle, and the defendant took part in carrying or keeping the item in the vehicle. See M Crim JI 11.2.

If the object possessed is a dagger, dirk, stiletto, or a double-edged nonfolding stabbing instrument, no further inquiry is required because the item is a dangerous item per se. *People v Lynn*, 459 Mich 53, 58; 586 NW2d 534 (1998). But "[i]f an item does not fall within one of those categories, the prosecution must proceed on the theory that it falls within the 'other dangerous weapon' category." *Id*. Under that category, the prosecution must show that "the instrument carried by the defendant is a dangerous weapon [p]er se or that the instrument was used, or intended for use, as a weapon for bodily assault or defense." *Brown*, 406 Mich at 222. A dangerous weapon per se includes not only the specific weapons identified in MCL 750.227(1), but also "similar articles[] designed for the purpose of bodily assault or defense[.]" *Vaines*, 310 Mich at 505. "Concealed carrying of weapons that are dangerous per se . . . is prohibited without regard to intent[.]" *People v Parker*, 288 Mich App 500, 507; 795 NW2d 596 (2010). Alternatively, the prosecution may show that the weapon was used, or intended for use, as a weapon for bodily assault or defense. *Brown*, 406 Mich at 222-223. See also *Parker*, 288 Mich App at 508 ("[C]oncealed carrying of other weapons is prohibited only when carried with assaultive or defensive intent."). The determination of whether the pointed instrument is a per se dangerous weapon or one used, or intended for use, as a weapon for bodily assault or defense is a question of fact. *Vaines*, 310 Mich 505-506; *People v Johnson*, 175 Mich App 56, 59; 437 NW2d 302 (1989).

In *People v Czerwinski*, 99 Mich App 304, 306; 298 NW2d 16 (1980), the defendant challenged whether the factual basis he provided in pleading guilty to CCW was sufficient.[11] Specifically, the defendant contended "there was no showing [that] the knife in question was a dangerous weapon per se or carried for purposes of assault or defense." *Id*. at 307. During the plea-taking, the defendant admitted to carrying a concealed switchblade with a 3-inch blade, which "was a dangerous weapon capable of inflicting very serious injury to a person." *Id*. This Court held that the defendant's admissions were sufficient for a jury to "draw an inculpatory inference that the weapon was per se a dangerous weapon within the meaning of the CCW statute" and that "[n]o more [was] required in this case." *Id*. at 307-308.

In *Brown*, however, the defendant was convicted of CCW after the police discovered "a rusty, black-handled machete" under the driver's seat of his vehicle. *Brown*, 406 Mich at 217. At trial, the defendant testified that he had purchased the machete at a department store to "throw at trees in his backyard for sport and to chop tree limbs." *Id*. The defendant also took the machete to a "friend's farm to cut up trees." *Id*. And the defendant used the machete to shorten a pair of trousers for a friend before placing it under his car's seat. *Id*. at 218. "The gist of the prosecutor's case was that a machete could be used as a dangerous weapon and that [the] defendant knew that it could be used as such." *Id*. Specifically, the defendant agreed that "a machete could be used as a dangerous weapon" because he had seen war movies where people had used a machete to decapitate an enemy. *Id*. at n 1.

---

[11] The defendant also pled no contest to assault with a dangerous weapon. *Czerwinski*, 99 Mich App at 306.

Our Supreme Court reversed and vacated the defendant's conviction for CCW. *Id*. at 216, 223. In doing so, it noted that the "defendant exhibited no hostility" against the police and "the record [was] totally barren of evidence" suggesting "that [the] defendant had any intention of using the machete as a weapon." *Id*. at 218. The Court further explained that "the fact that a pointed instrument, such as a machete, has great potential as a dangerous weapon does not render it a dangerous weapon [p]er se." *Id*. at 222-223. And the Court held that "mere proof that [the] defendant knew that a machete could be used as a dangerous weapon [did] not support a conviction under MCL §750.227[]." *Id*. at 223.

Years later, this Court specifically addressed a situation where the defendant possessed a butterfly knife. *Tetreau*, unpub op at 1. There, a police officer arrested the defendant for drunk driving and found a butterfly knife in his jacket pocket, which was described as "a double[-]edged knife which has a handle that folds down over it[.]" *Id*. The defendant claimed the knife was a gift from his wife which he always carried. The defendant further denied carrying the knife for assaultive or defensive purposes. *Id*. The trial court denied defendant's motion for a directed verdict because the defendant had offered no explanation about why he was carrying the knife. *Id*. After the defendant was convicted, he appealed, arguing that there was insufficient evidence to sustain his conviction. *Id*. This Court determined that the prosecutor presented no evidence that the knife was dangerous per se. *Id*. at 2. Additionally, there was no evidence to rebut the defendant's testimony that he had carried the knife, which was a gift from his wife, for seven to ten years. *Id*. This Court rejected the prosecution's argument that the defendant's testimony was not credible, reasoning:

> There was no credibility contest in this case because there was no testimony or evidence that contradicted defendant. Defendant is not required to prove that he had an innocent reason for having the knife with him. Defendant showed no hostility to the officer when he was arrested, he had the knife in a zipped pocket, he told the officer about it, and he was arrested for drunk driving. There were no circumstances in this case that would give rise to the inference that the knife was carried for assaultive or defensive purposes. [*Id*.]

Accordingly, this Court reversed the defendant's CCW conviction. *Id*.

## C. DISCUSSION

On appeal, the prosecution contends it presented evidence that defendant's butterfly knife was a dangerous weapon per se, and, therefore, no evidence of defendant's intent was required. Specifically, the prosecution highlights Gaiser's testimony about how the butterfly knife folded over on itself and how it operated, allowing a person to grab one side or the other and snap it open. Further, the knife itself was admitted as was a photograph of the knife, showing it to be about 9 inches in length with an approximately 4-inch blade. The tip of the blade was sharp and Gaiser testified that it was "[i]mmediately apparent" to him that it "could pose as a dangerous weapon[.]"

When Gaiser searched defendant's truck and seized the butterfly knife, he was "looking for anything that was dangerous to" an officer. Gaiser located no other weapons in defendant's truck. Gaiser further agreed that defendant had "multiple dangerous stabbing weapons

-11-

within . . . arm's reach[.]" Peters also agreed that the butterfly knife was sharp, easily opened, and could be used to inflict great bodily harm on another.

Admittedly, it is not clear whether the prosecutor proceeded under the theory that the butterfly knife was a dangerous stabbing weapon per se. Despite discussing the knife's design,[12] the prosecutor recognized all of the knives had "peaceful" uses, vacillated on whether the butterfly knife had a single blade or two blades,[13] and he did not oppose the trial court instructing the jury on the hunting knife exception.[14]

Regardless, the jury was properly instructed to determine "from all the facts and circumstances whether the evidence shows that the knives in question here were a [sic] dangerous stabbing weapon." And that "[a] dangerous stabbing weapon is any object that is carried as a weapon for bodily assault or defense and that is likely to cause serious physical injury or death when used as a stabbing weapon." The court further informed the jury:

> Some objects, such as guns or bombs, are dangerous because they are specifically designed to be dangerous. Other objects are designed for peaceful purposes but may be used as dangerous weapons. The way an object is carried determines whether or not it is a dangerous weapon. If an object is carried for use as a stabbing weapon, and is likely to cause serious physical injury or death when used as a stabbing weapon, it is a dangerous stabbing weapon.

Defendant's jury determined that the butterfly knife, but not the other two knives, were carried for use as a stabbing weapon. This determination was supported by the evidence presented at trial.

---

[12] Cf. *State v Caballero*, 786 NW2d 873, * 2 (Iowa, 2010) (The appellate court "did not believe the primary design of the butterfly knife is a matter of common knowledge, observation, or experience.") with *In re FAB*, 682 NW2d 82, * 1 (2004) (There was sufficient evidence that a balisong or butterfly knife was designed as a dangerous weapon under Iowa law where the prosecution presented evidence from the owner of a martial arts school, who had 20 years of experience using a balisong, which he testified "was developed in the Philippines as a weapon for fighting and used historically by farmers to defend themselves." The witness "further testified that the balisong is especially suited to fighting because it has swinging handles which can suddenly expose a blade and surprise opponents, or is can create a block to deflect an opponent's attacks." Further, "the balisong is used primarily today for street fighting.").

[13] This Court recognized that prior appellate decisions held that "similar double-edged, stabbing knives, were dangerous weapons per se." *People v Payne*, 180 Mich App 283, 285-286; 446 NW2d 629 (1989).

[14] The hunting knife exception applies when an item is "any other dangerous weapon," but not when it is an enumerated weapon in MCL 750.227(1). *Payne*, 180 Mich App at 284-287.

The trial evidence here shows that it was about 11:20 p.m. when the police saw defendant parked in the fairgrounds in violation of the posted signs. Defendant had a fixed-blade knife on his console and its sheath was either on the front driver or passenger seat. Defendant later shared with Peters that he was sharpening that knife; however, when defendant testified, he initially denied having such a conversation before admitting that he told Peters he intended to sharpen the knife. "A jury may infer consciousness of guilt from evidence of lying or deception." *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008).

And it was only after Peters advised defendant about his intention to pat him down that defendant informed Peters about the folding knife that he referred to as a "pocketknife." Defendant also consented to the search of his truck, but he did not disclose the presence of the butterfly knife in its center console.

When Gaiser located the butterfly knife, defendant said that he had forgotten about it and that he used the butterfly knife "for party tricks with his friends." At trial, defendant testified he used the butterfly knife for "tricks"; however, he also testified: "I don't even use it." Notably, defendant further opined that the butterfly knife was unreliable if used to assault someone. Defendant denied his opinion was rooted in familiarity with using knives for assault or defense, but rather on his knowledge that they were "very faulty."

In contrast, defendant rattled off numerous other peaceful uses for his other two knives. Beginning with the fixed-blade knife, defendant described it as being "highly versatile," and he used it to make peanut butter sandwiches, process fatwood, harvest Chaga, and to process fish and turtles. Similarly, defendant used the folding knife in found in his pocket "for cutting, mostly making feather sticks to make fires[,]" for processing wood, and "[a] lot of stuff."

The jury had the opportunity to observe defendant testify and judge his credibility not only from his words but also from his "tonal quality, volume, speech patterns, and demeanor." *People v Lemmon*, 456 Mich 625, 646; 576 NW2d 129 (1998). Because defendant had been homeless for years and had his possessions in his truck, the jury may not have credited his testimony that he had forgotten about his butterfly knife, that he "would have to imagine it was buried at the bottom of the center console," that he either performed tricks with it or he did not use it at all, that it was not dependable if used to assault another, or that defendant knew such knives were "very faulty." Instead, the jury could reasonably infer that the butterfly knife's folding design made it and the knife inside easily concealable. The design also allowed defendant to easily deploy and lock the butterfly knife to inflict serious harm on another. Furthermore, defendant opted not to store his knife in an inaccessible location in his truck,[15] where he had his possessions, but in his center console, where it was within reach to protect himself and his possessions, i.e., for purposes of defense or assault.

---

[15] For example, defendant testified that he retrieved his fixed-blade knife from his truck's tackle box that night, meaning that he knew of storage options outside of his immediate reach.

I recognize that defendant was compliant with the police[16] and that it is insufficient to simply show that the butterfly knife was sharp or that defendant opined that the butterfly knife could be employed as a dangerous stabbing weapon. *Brown*, 406 Mich at 218, 222-223; *Tetreau*, unpub op at 2. But *Brown* is distinguishable because the defendant had a single rusty machete, purchased in a department store, that he used for several peaceful purposes, including chopping tree limbs, throwing at trees, and shortening a pair of pants. *Brown*, 406 Mich at 217-218 n 1. Brown did not have three separate knives, let alone one designed to conceal its blade and easily open like the butterfly knife at issue here. *Tetreau* is also distinguishable because the defendant there disclosed the knife's presence to the police, *Tetreau*, unpub op at 2, which defendant, who had two additional knives, did not do here. I further disagree with *Tetreau* panel's suggestion that there is no credibility question presented when the prosecution fails to directly challenge a defendant's testimony. *Id*. Our caselaw is well-settled that it is up to the finder of fact, not this Court, to make decisions about the credibility of a trial witnesses' testimony. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). The jury, in its role as factfinder, has the constitutional responsibility to not only ascertain the facts, but apply the law to those facts and reach the ultimate conclusion of guilt or innocence. *United States v Gaudin*, 515 US 506, 514-515; 115 S Ct 2310; 132 L Ed 2d 444 (1995); see also *Lemmon*, 456 Mich at 644 ("If the evidence is nearly balanced or is such that different minds would naturally and fairly come to different conclusions, the judge may not disturb the jury findings although his judgment might incline him the other way.") (quotation marks and citation omitted). Thus, "[a] jury is free to believe and disbelieve, in whole or in part, any of the evidence presented." *People v Baskerville*, 333 Mich App 276, 283; 963 NW2d 620 (2020) (quotation marks and citation omitted). This means that "[t]he jury may choose to believe part of a witness's testimony and disbelieve another part of the same witness's testimony." *Id*.

In addressing a challenge to the sufficiency of the evidence, this Court's role is simply to "draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Viewing the evidence presented at trial in the light most favorable to the prosecution, a rational jury could conclude that there was sufficient evidence to support defendant's conviction for CCW in a vehicle. Therefore, I would affirm defendant's conviction.

/s/ Anica Letica

---

[16] Given that there were two fully uniformed officers, defendant's compliance is understandable.

-14-